**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

VISHAL SHAH and BRIAN HEINZ, as individuals, on behalf of themselves, the general public, and those similarly situated,

Plaintiffs,

v.

MAZDA MOTOR OF AMERICA, INC.

Defendant.

CASE NO.

CLASS ACTION COMPLAINT FOR INVASION OF PRIVACY; INTRUSION UPON SECLUSION; WIRETAPPING IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 631); USE OF A PEN REGISTER IN VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT (CALIFORNIA PENAL CODE § 638.51); COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT

JURY TRIAL DEMANDED

## TABLE OF CONTENTS


INTRODUCTION ........ 3

THE PARTIES ........ 5

JURISDICTION AND VENUE ........ 5

TOLLING AND RELATED ARBITRATION PROCEEDING ........ 5

SUBSTANTIVE ALLEGATIONS ........ 7

- A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies. ........ 7
- B. Defendant Falsely Informed Users That They Could Decline the Website's Use of "All" Cookies and Tracking Technologies. ........ 12
- C. The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website. ........ 16
  - 1. Google Cookies. ........ 16
  - 2. Adobe Cookies. ........ 22
- D. The Third Parties Intercept User Communications While in Transit. ........ 24
- E. The Signaling and Addressing Information Intercepted by the Third Parties. ........ 26
- F. The Private Communications Collected are Valuable. ........ 28

PLAINTIFFS' EXPERIENCES ........ 29

CLASS ALLEGATIONS ........ 34

CAUSES OF ACTION ........ 37

- First Cause of Action: Invasion of Privacy (on behalf of the Class) ........ 37
- Second Cause of Action: Intrusion Upon Seclusion (on behalf the Class) ........ 39
- Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) (on behalf the Subclass) ........ 41
- Fourth Cause of Action: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) (on behalf of the Subclass) ........ 44
- Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation (on behalf of the Class) ........ 46
- Sixth Cause of Action: Unjust Enrichment (on behalf of the Class) ........ 50

PRAYER FOR RELIEF ........ 51

Plaintiff Vishal Shah and Plaintiff Brian Heinz (together, the "Plaintiffs") bring this action on behalf of themselves, the general public, and all others similarly situated against Mazda Motor Of America, Inc. ("Defendant" or "Mazda"). Plaintiffs' allegations against Defendant are based on information and belief and the investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based on their personal knowledge.

**INTRODUCTION**

1. This Class Action Complaint concerns egregious violations of consumer privacy and a breach of consumer trust in violation of California law. When consumers visit Defendant's commercial website (www.mazdausa.com, the "Website"), Defendant displays to them a popup cookie consent banner. Defendant's cookie banner discloses that the Website uses cookies but expressly gives users the option to control how they are tracked and how their personal data is used. Defendant assures visitors that they can choose to "DECLINE ALL" cookies and technologies used "to personalize and enhance your experience[,]" as shown in the following screenshot:




2. Like most internet websites, Defendant designed the Website to include resources and programming scripts from third parties that cause those parties to place cookies and other similar tracking technologies on visitors' browsers and devices and/or transmit cookies along with user data. Unlike many websites, however, Defendant affirmatively represented that users

could browse the Website without being tracked, followed, or targeted by third-party data brokers and advertisers. Those representations were false.

3. Even after users elect to "DECLINE ALL" cookies and technologies, Defendant nonetheless caused multiple third parties—including Google LLC (YouTube) and Adobe Inc. (omtrdc.net)—to place and/or transmit cookies that track users' website browsing activities and intercepted their private communications on the Website (the "Third Parties").

4. Contrary to users' express declination of cookies and tracking technologies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to Plaintiffs and other visitors' browsers, stored on their devices, and intercepted by the Third Parties along with user data. These cookies permitted the Third Parties to track and collect data in real time regarding Website visitors' behaviors and communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

5. The Third Parties analyze and aggregate this user data across websites and time for their own purposes and financial gain, including, creating consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; creating audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and performing targeted advertising and marketing analytics. Further, the Third Parties share user data and/or user profiles to unknown parties to further their financial gain.

6. This type of tracking and data sharing is exactly what the Website visitors sought to avoid when they clicked or selected the "DECLINE ALL" button on the Website's cookie consent banner. Defendant falsely told Website users that it respected their privacy choices and would refrain from tracking and data sharing when users rejected cookies. Despite receiving clear notice of users' lack of consent, Defendant ignored those choices and violated state statutes and tort duties owed to Plaintiffs and those similarly situated Website users.

## THE PARTIES

7. Plaintiff Vishal Shah is, and was at all relevant times, an individual and resident of San Jose, California. Plaintiff Shah intends to remain in California and makes his permanent home there.

8. Plaintiff Brian Heinz is, and was at all relevant times, an individual and resident of West Sacramento, California. Plaintiff Heinz intends to remain in California and makes his permanent home there.

9. Defendant Mazda Motor of America, Inc. is a California corporation with its principal place of business in Irvine, California.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2). The proposed Class and Subclass consist of at least 100 members, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the proposed Class is a citizen of a state different from Defendant.

11. The injuries, damages and/or harm upon which this action is based, occurred or arose out of activities engaged in by Defendant within, affecting, and emanating from, the state of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products and services provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

12. Further, the Private Communications and data which Defendant causes to be intercepted by Third Parties are routed through servers located in California.

13. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

14. Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

## TOLLING AND RELATED ARBITRATION PROCEEDING

15. The delayed discovery rule applies to Plaintiffs' and the Class members' claims.

Plaintiffs and Class members were unaware that even though they declined all cookies on the Website, Defendant caused cookies, including the Third Parties' cookies, to be sent to their browsers, stored on their devices, and intercepted by the Third Parties along with their private user data until they learned of Defendant's privacy violations from their counsel. As alleged below, Plaintiffs do not have the expertise to test whether the Website honored users' requests to decline all cookies.

16. On or about September 30, 2023, Plaintiff Shah notified Defendant that he alleged that Defendant knowingly (and without consent) caused third-party cookies and corresponding data to be stored on consumers' devices and/or intercepted by third parties when they visit the Website despite consumers' clear declination of such third-party cookies. Plaintiff Shah further notified Defendant that he intended to pursue his claims on behalf of himself and other similarly situated class members.

17. The Website's Terms of Use ("TOU") contains an arbitration agreement that purports to require all Website visitors to arbitrate their disputes with Defendant before the American Arbitration Association ("AAA").

18. On January 4, 2024, Plaintiff Shah filed a demand for arbitration in San Francisco with AAA against Defendant. See Ex. A. Plaintiff Shah alleged the same misconduct in the arbitration that he alleges in this Complaint.

19. Arbitrator Jonathan Pollard was assigned as the arbitrator.

20. Following an initial conference, the Arbitrator ordered briefing regarding his jurisdiction and arbitrability.

21. After receiving briefing and supporting evidence from the parties, the Arbitrator issued a final order/award, dated February 28, 2025, concluding: (a) he had authority to decide threshold arbitrability issues; (b) Plaintiff Shah did not waive his right to contest arbitrability; and (c) Plaintiff Shah's claims are not subject to Mazda's TOU. Ex. B.

22. The AAA subsequently issued a closing letter, dated March 7, 2025, confirming that it had closed the arbitration. Ex. C.

23. Despite exercising reasonable diligence, Plaintiffs and Class members were

unaware of Defendant's fraudulent and unlawful conduct alleged herein due to its active concealment of material facts, which prevented Plaintiffs and Class members from discovering their claims sooner. Further, Plaintiff Shah's claims were equitably tolled by his demand letter and his filing of the arbitration proceeding because Defendant had notice of the claims (and his intent to pursue them in court as a putative class action). Defendant was not prejudiced in its ability to gather evidence for Plaintiffs' and Class members' claims since their claims in this Complaint are substantially similar to those in Plaintiff Shah's demand letter and his arbitration proceeding. These extraordinary circumstances, including Defendant's intentional misrepresentations and Plaintiff Shah's pursuit of the claims in the arbitration proceeding, warrant tolling of the statute of limitations to allow Plaintiffs and Class members to pursue their claims in this forum. Plaintiffs acted in good faith and engaged in reasonable conduct in filing the Complaint in this action.

## SUBSTANTIVE ALLEGATIONS

### A. Defendant Programmed the Website to Include Third-Party Resources that Utilize Cookie-Based Tracking Technologies.

24. Every website, including the Website, is hosted by a server that sends and receives communications in the form of HTTP requests, such as "GET" or "POST" requests, to and from Internet users' browsers. For example, when a user clicks on a hyperlink on the Website, the user's browser sends a "GET" request to the Website's server. The GET request tells the Website server what information is being requested (e.g., the URL of the webpage being requested) and instructs the Website's server to send the information back to the user (e.g., the content of the webpage being requested). When the Website server receives an HTTP request, it processes that request and sends back an HTTP response. The HTTP request includes the client's IP address, which allows the Website server to identify the origin of the request and return the response.

25. An IP address (Internet Protocol address) is a unique numerical label assigned to each device connected to a network that uses the Internet Protocol for communication, typically expressed as four sets of numbers separated by periods (e.g., 192.168.123.132 for IPv4

addresses). IP addresses can identify the network a device is on and the specific device within that network. Public IP addresses used for internet-facing devices reveal geographical locations, such as country, city, or region, through IP geolocation databases.

26. As a result, Defendant knew or should have known that the devices used by Plaintiffs and Subclass members to access the Website were located in California.

27. Defendant voluntarily integrated "third-party resources" from the Third Parties into its Website programming. "Third-party resources" refer to tools, content or services provided by third parties, such as analytics tools, advertising networks, or payment processors, that a website developer utilizes by embedding scripts, styles, media, or application programming interface (API) into the website's code. Defendant's use of the third-party resources on the Website is done so pursuant to agreements between Defendant and those Third Parties.

28. The Website causes users' devices to store and/or transmit both first-party and third-party tracking cookies. Cookies are small text files sent by a website server to a user's web browser and stored locally on the user's device. As described below, cookies generally contain a unique identifier which enables the website to recognize and differentiate individual users. Cookie files are sent back to the website server along with HTTP requests, enabling the website to identify the device making the requests, and to record a session showing how the user interacts with the website.

29. First-party cookies are those that are placed on the user's device directly by the web server with which the user is knowingly communicating (in this case, the Website's server). First-party cookies are used to track users when they repeatedly visit the same website.

30. A third-party cookie is set by a third-party domain/webserver (e.g., www.youtube.com; omtrdc.net, etc.). When the user's browser loads a webpage (such as a webpage of the Website) containing embedded third-party resources, the third parties' programming scripts typically issue HTTP commands to determine whether the third-party cookies are already stored on the user's device and to cause the user's browser to store those cookies on the device if they do not yet exist. Third-party cookies include an identifier that allows

the third-party to recognize and differentiate individual users across websites (including the Website) and across multiple browsing sessions.

31. As described further below, the third-party cookies stored on and/or loaded from users' devices when they interact with the Website are intercepted by those third parties, enabling them to surreptitiously track in real time and collect Website users' personal information, such as their browsing activities and private communications with Defendant, including the following:

- **Browsing History**: Information about the webpages a Website user visits, including the URLs, titles, and keywords associated with the webpages viewed, time spent on each page, and navigation patterns;
- **Visit History**: Information about the frequency and total number of visits to the Website;
- **Website Interactions**: Data on which links, buttons, or ads on the Website that a user clicks;
- **User Input Data**: The information the user entered into the Website's form fields, including search queries, the user's name, age, gender, email address, location, and/or payment information;
- **Demographic Information**: Inferences about age, gender, and location based on browsing habits and interactions with Website content;
- **Interests and Preferences**: Insights into user interests based on the types of Website content viewed, products searched for, or topics engaged with;
- **Shopping Behavior**: Information about the Website products viewed or added to shopping carts;
- **Device Information**: Details about the Website user's device, such as the type of device (mobile, tablet, desktop), operating system, and browser type;
- **Referring URL**: Information about the website that referred the user to the Website;

- **Session Information**: Details about the user's current Website browsing session, including the exact date and time of the user's session, the session duration and actions taken on the Website during that session;
- **User Identifiers**: A unique ID that is used to recognize and track a specific Website user across different websites over time; and/or
- **Geolocation Data**: General location information based on the Website user's IP address or GPS data, if accessible, including whether the user is located in California.

(Collectively, the browsing activities and private communications listed in the bullet points above shall be referred to herein as "Private Communications").

32. Third-party cookies can be used for a variety of purposes, including (i) analytics (e.g., tracking and analyzing visitor behavior, user engagement, and effectiveness of marketing campaigns); (ii) personalization (e.g., remembering a user's browsing history and purchase preferences to enable product recommendations); (iii) advertising/targeting (e.g., delivering targeted advertisements based on the user's consumer profile (i.e., an aggregated profile of the user's behavior, preferences, and demographics); and (iv) social media integration (e.g., enabling sharing of users' activities with social media platforms). Ultimately, third-party cookies are utilized to enhance website performance and generate revenue through data collection and targeted advertising.

33. Defendant distributes, markets, and sells Mazda-brand motor vehicles and related products and services in the United States. Defendant also owns and operates the Website, which allows visitors to, among other things, obtain information regarding Mazda vehicles, browse and compare vehicle models and features, configure vehicles, view pricing and special offers, request quotes, explore financing and leasing options, locate nearby dealers, schedule test drives or service, and otherwise research or facilitate the purchase of a Mazda vehicle. As users interact with the Website—including by entering information into forms, searching for vehicles or dealers, selecting vehicle models, trims, features, and financing options, clicking links, and navigating webpages—they communicate Private Communications to Defendant, including their

browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

34. Defendant chose to install or integrate its Website with resources from the Third Parties that, among other things, use cookies. Thus, when consumers visit the Website, both first-party cookies and third-party cookies are placed on their devices and/or transmitted. This is caused by software code that Defendant incorporates into its Website, or that Defendant causes to be loaded. Because Defendant controls the Website's software code, and is capable of determining whether a user is accessing the Website from California, it has complete control over whether first-party and third-party cookies are placed on its California users' devices and/or intercepted by third parties.

35. Defendant explained the third-party cookies it used on the Website as follows in its Privacy Policy:

> We and our third-party partners use web cookies, beacons, pixels, and similar digital technologies ("Cookies") to collect information about your usage of and interactions with the Online Services and third-party websites, applications, and advertisements to enhance your customer experience. These Cookies are used for analytics purposes, to learn how visitors interact with the Online Services, to improve the Online Services, to facilitate your preferences (including opt-out requests), and to assess and facilitate the delivery of effective digital advertising on the Online Services and third-party platforms, including advertising that is personalized based on your inferred interests and preferences.
>
> There are two categories of Cookies on our website, "Required" and "Advertising" Cookies. Required Cookies consist of three subcategories, "Strictly Necessary", "Functional" and "Performance" Cookies. Strictly Necessary Cookies are necessary for the website to function and cannot be switched off in our systems. You can set your browser to block or alert you about these Cookies, but some parts of the website will not work without them. Functional Cookies are cookies that allow websites to remember choices you make to give you better functionality and personal features. Performance Cookies are cookies that allow websites to remember choices you make to give you better functionality and personal features. Required Cookies are needed to ensure a smooth operating experience for the website user, and you cannot opt out of these Cookies. Advertising Cookies collect information about your online activities on this website for the purpose of delivering relevant advertisements across our websites and/or online services. If you do not allow these Cookies, you will continue to see ads placed through other criteria but the advertising you experience will be less targeted and may be less relevant to you. Turning off Advertising Cookies operates as an opt-out of "sales"

and disclosure or use of personal information with third parties for targeted advertising…[1]

**B. Defendant Falsely Informed Users That They Could Decline the Website's Use of "All" Cookies and Tracking Technologies.**

36. When Plaintiffs and other consumers in California visited the Website, the Website immediately displayed to them a popup cookie consent banner. As shown in the screenshot below, the cookie consent banner stated, "We use technologies to personalize and enhance your experience on our site…If you agree to our use of these technologies, please select I AGREE below." The banner then purported to provide users the opportunity, rather than choosing to agree to the use of such cookies and technologies, to instead "DECLINE ALL" such cookies and technologies in use "ON THIS SITE[,]" as shown in the following screenshot from the Website:




37. Plaintiffs and other Website users who clicked or selected the "DECLINE ALL" button, indicating their choice and/or agreement to decline or reject all cookies and tracking technologies in use on the Website, could then continue to browse the Website, as the popup cookie consent banner disappeared.

38. Defendant's popup cookie consent banner led Plaintiffs, and all those Website users similarly situated, to believe that they declined or rejected all cookies and tracking

[1] Mazda Privacy Policy (available at https://www.mazdausa.com/site/privacy).

technologies, especially those used to "personalize and enhance [user] experience on [Defendant's] site." The banner further reasonably led Plaintiffs and those Website users similarly situated to believe that Defendant would not allow third parties, through cookies, to access their Private Communications with the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, upon clicking or selecting the "DECLINE ALL" button.

39. Defendant's representations, however, were false. In truth, Defendant did not abide by Plaintiffs' or other users' wishes. When Plaintiffs and other Website users clicked or selected the "DECLINE ALL" button, they provided notice to Defendant that they did not consent to the placement or transmission of third-party cookies that would allow those parties to obtain their Private Communications with the Website.

40. Nevertheless, even after receiving that notice, Defendant caused third-party tracking cookies, including the Third Parties' cookies, to be placed on Website users' browsers and devices and/or intercepted by the Third Parties which enabled the Third Parties to collect user data in real time that discloses Website visitors' Private Communications, including browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data. In other words, even when consumers like Plaintiffs tried to protect their privacy by declining "ALL" cookies, Defendant failed to prevent cookies from being intercepted by the Third Parties, enabling them to track user behavior and communications.

41. Some aspects of the operations of the Third-Party cookies on the Website can be observed using specialized tools that log incoming and outgoing Website network transmissions. The following screenshot, obtained using one such tool, shows examples of Third-Party cookies being transmitted from a Website user's device and browser to Third Parties even after the user clicked or selected the "DECLINE ALL" button on the Website's popup cookie consent banner.




42. The screenshot above shows the "Network" tab of Chrome Developer Tools, which contains a list of HTTP network traffic transmissions between the user's browser and various third-party websites while the user visited and interacted with Defendant's Website at https://www.mazdausa.com. The screenshot depicts only network traffic occurring ***after*** the user declined all cookies using the cookie banner. As shown above, despite the user's declination of all cookies, the user's interactions with the Website resulted in the user's browser making a large number of GET and POST HTTP requests to third party web domains like www.youtube.com and omtrdc.net. As further shown in the right-hand column of the screenshot, the user's browser sent cookies along with those HTTP requests to the third parties. This screenshot demonstrates that Defendant caused third-party cookie data and users' Private Communications to be intercepted by Third Parties, even after consumers declined or rejected all cookies and tracking technologies by clicking or selecting the "DECLINE ALL" button. All of these network calls

are made to the Third Parties without the user's knowledge, and despite the user's declination of "ALL" cookies.

43. Plaintiffs' and other Website users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, were surreptitiously obtained by the Third Parties via these cookies.

44. As users interact with the Website, even after clicking or selecting the "DECLINE ALL" button, thereby declining or rejecting the use of cookies and similar technologies for personalized content, as well as the sale or sharing of the user's personal information with third parties for such functions, or other purposes, more data regarding users' behavior and communications is intercepted by third parties, alongside the cookie data. The Third Party cookies that Defendant wrongfully allows to be stored on users' devices and browsers, and to be intercepted by the Third Parties, cause the Third Parties to track and collect data on users' behaviors and communications, including Private Communications, on the Website. Because third-party cookies cause the Third Parties to track users' behavior across the Internet and across time, user data can be correlated and combined with other data sets to compile comprehensive user profiles that reflect consumers' behavior, preferences, and demographics (including psychological trends, predispositions, attitudes, intelligence, abilities, and aptitudes). These Third Parties monetize user profiles for advertising, sales, and marketing purposes to generate revenue and target advertising to Internet users. Advertisers can gain deep understanding of users' behavioral traits and characteristics and target those users with advertisements tailored to their consumer profiles and audience segments.

45. The Third Parties' code that the Website causes to be loaded and executed by the user's browser constitutes a wiretap because, when it is executed, it causes the Third Parties—separate and distinct entities from the parties to the conversations—to use cookies to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties. When the Third Parties use their respective wiretaps on Website users' Private Communications, the

wiretaps are not like tape recorders or "tools" used by one party to record the other. The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes as described in more detail below.

### C. The Private Communications Intercepted and Collected Through Third-Party Cookies on Defendant's Website.[2]

#### 1. Google Cookies.

46. Defendant causes third-party cookies and related communications to be transmitted to and from Website users' browsers and devices through Google LLC's YouTube service, including communications with the **www.youtube.com** domain, even after users select "DECLINE ALL" cookies, including cookies used to provide personalized content. Defendant integrates YouTube's embedded-player technology into the Website, thereby causing users' browsers to communicate with Google-controlled YouTube domains when users visit the Website.

47. Google uses cookies and similar technologies in connection with YouTube for several purposes, including analytics, personalization, and advertising.[3] For example, Google explains that the "VISITOR_INFO1_LIVE" cookie may enable personalized recommendations on YouTube based on a user's past views and searches.[4] Further, Google discloses that "Google services also use … '__Secure-YNID,' 'VISITOR_INFO1_LIVE', '__Secure-YENID,' and '__Secure-YEC' cookies on YouTube, for analytics."[5] Google further states that YouTube may use cookies and similar technologies, including "__Secure-YNID" and "VISITOR_INFO1_LIVE," for advertising purposes.[6] Thus, cookies transmitted through YouTube are capable of enabling Google to recognize and analyze users' interactions on the Website and to use information concerning those interactions for personalization, recommendations, analytics, and advertising.

---

[2] This section contains multiple examples of specific data being sent from a user's browser to third parties. Each example was collected after the user had clicked or selected the "DECLINE ALL" button.

[3] *See* How Google uses cookies (available at https://policies.google.com/technologies/cookies/embedded?client_theme=dark).

[4] *Id.*

[5] *Id.*

[6] *Id.*

48. Google's cookies allow it to obtain and store at least the following user data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data—including whether a user is located in California.[7]

49. For example, after a user rejects cookies the Google software code that Defendant causes to be stored on and executed by the Website user's device causes various types of data to be sent to Google's domain, at www.youtube.com, including cookie data. For example:




| Key | Value |
|---|---|
| :authority | www.youtube.com |
| :method | POST |
| :path | /youtubei/v1/log_event?alt=json&key=AIzaSyAO_FJ2SlqU8Q4STEHLGCilw_Y9_11qcW8 |
| :scheme | https |
| accept | */* |
| accept-encoding | gzip, deflate, br |
| accept-language | en-US,en;q=0.9 |
| authorization | SAPISIDHASH 1695345871_5567785c302280d10aab0ea26950a44b54b384f2 |
| content-length | 850 |
| content-type | application/json |

[7] *See* About the Google Tag (available at https://support.google.com/searchads/answer/7550511?hl=en); How Floodlight Recognizes Users (available at https://support.google.com/searchads/answer/2903014?hl=en); How Google Ads tracks website conversions (available at https://support.google.com/google-ads/answer/7521212); Google Ads Help, Cookie: Definition (available at https://support.google.com/google-ads/answer/2407785?hl=en); About demographic targeting in Google Ads (available at https://support.google.com/searchads/answer/7298581?hl=en&sjid=1196213575075458908-NC&visit_id=638670675669576522-2267083756&ref_topic=7302618&rd=1); How Google Analytics Works (https://support.google.com/analytics/answer/12159447); Set up events (available at https://developers.google.com/analytics/devguides/collection/ga4/events); and Recommended events (available at https://support.google.com/analytics/answer/9267735).

| | |
|---|---|
| cookie | __Secure-3PSID=bQiz-oKf7Z-8gIB2UXQAgbT4LElhRmJyBNi1oncMdM93hzmkSi5SxIrd0IUh7rqFqdJRmQ.; __Secure-3PAPISID=H1k8LsLZRQ7SMEh1/AzOyDZrKp7m4zLwgu; YSC=Qa89eWAzPj4; VISITOR_INFO1_LIVE=Bmm06WRhKfc; LOGIN_INFO=AFmmF2swRQIgEcaVoysH-_I81oByopvwilVds_1Evo5J8Iw4QtTGFGQCIQCUttWu8UArfuiDScfmsZI2-KUOM_HkEPqW2Z2tCFPdmA:QUQ3MjNmeHdqc0ZXekM3ZE51dHAtTmpsdV9pOEYzZVR3a3FsZWNrUjV5TlhPZC0wbDMzNXBUeWJSc054SERoWXlKNGlQdGxQRWNGSXV4U3lQZDVGVnJPWGlCUGVCWDJlNzhEUWlMZVMwSDZmVWdyM3RQWFVvRmRMbm52ckxuWTJPaWdzWWlIN1hBSWVoNnhHand5aVVjSWw3QUJ6em9heUdn; __Secure-3PSIDCC=APoG2W97OsBjRKzOMy7kuOvnalCLrXTT3AS2CAdMB5p_tPMQYmTmL5buKr16hqNF1Ie7FAOR |
| dnt | 1 |
| Host | www.youtube.com |
| origin | https://www.youtube.com |
| referer | https://www.youtube.com/embed/0m8mnYvXJss?enablejsapi=1&rel=0&showinfo=0&autohide=2&origin=https%3A%2F%2Fwww.mazdausa.com&widgetid=1 |
| sec-ch-ua | "Chromium";v="116", "Not)A;Brand";v="24", "Google Chrome";v="116" |
| sec-ch-ua-mobile | ?0 |
| sec-ch-ua-platform | "macOS" |
| sec-fetch-dest | empty |
| sec-fetch-mode | cors |
| sec-fetch-site | same-origin |
| user-agent | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/116.0.0.0 Safari/537.36 |
| x-client-data | CJe2yQEIo7bJAQiKksoBCKmdygEI++zKAQiVocsBCIagzQEIucjNAQi5ys0BCNDLzQEY9MnNARjrjaUX |
| x-goog-authuser | 0 |
| x-goog-request-time | 1695345871377 |
| x-goog-visitor-id | CgtCbW0wNldSaEtmYyjI2LOoBjIICgJVUxICGgA%3D |
| x-origin | https://www.youtube.com |
| x-youtube-ad-signals | dt=1695345766757&flash=0&frm=2&u_tz=-300&u_his=2&u_h=900&u_w=1440&u_ah=772&u_aw=1440&u_cd=30&bc=31&bih=-12245933&biw=-12245933&brdim=0%2C25%2C0%2C25%2C1440%2C25%2C1440%2C772%2C868%2C489&vis=1&wgl=true&ca_type=image |

| | |
|---|---|
| x-youtube-client-name | 56 |
| x-youtube-client-version | 1.20230919.12.00 |
| x-youtube-time-zone | America/Chicago |
| x-youtube-utc-offset | -300 |
| x-yt-auth-test | test |

POST 200 https://www.youtube.com/youtubei/v1/log_

Request Header Query Body Cookies Auth Raw Summary +

| Key | Value |
|---|---|
| alt | json |
| key | AIzaSyAO_FJ2SlqU8Q4STEHLGCilw_Y9_11qcW8 |

POST 200 https://www.youtube.com/youtubei/v1/log_

Request Header Query Body Cookies Auth Raw Summary + JSON


```
{
  "context": {
    "client": {
      "hl": "en",
      "gl": "US",
      "clientName": 56,
      "clientVersion": "1.20230919.12.00",
      "configInfo": {
        "appInstallData":
        "COXYs6gGEOuTrgUQ1eWvBRDp6P4SEJ_jrwUQ4vKvBRD65P4SELWmrwUQ0-GvBRC4i64FEJfn_hIQ57qvBRDZya8FEKbs_hIQ6-j-EhDqw68FEIjjrwUQ50avBRCG6q8FEPOorwUQrLevBRC8zP4SEMyu_hIQ5LP-EhCj3q8FEKfq_hIQx-avBRDW6q8FEMzfrgUQ4_CvBRDZ7q8FELTJrwUQ3ej-EhDE3a8FEKXC_hIQvbauBQ%3D%3D"
      },
      "userAgent": "Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/116.0.0.0 Safari/537.36",
      "screenDensityFloat": "2",
      "connectionType": "CONN_CELLULAR_4G"
    },
    "thirdParty": {
      "embedUrl": "https://www.mazdausa.com/"
    }
  },
```

```
"events": [
  {
    "eventTimeMs": 1695345871376,
    "finalPayload": {
      "csn": "MC45ODE4MjkyMzI1NTUxMTIx"
    },
    "context": {
      "lastActivityMs": "103876"
    }
  }
],
"serializedClientEventId": {
  "serializedEventId": "ZewMZZX4MMeAkwbjx5voDQ",
  "clientCounter": "4765"
}
}
```


POST 200 https://www.youtube.com/youtubei/v1/log_

Request Header Query Body Cookies Auth Raw Summary +

| Key | Value |
|---|---|
| __Secure-3PSID | bQiz-oKf7Z-8glB2UXQAgbT4LElhRmJyBNi1oncMdM93hzmkSi5Sxlrd0IUh7rqFqdJRmQ. |
| __Secure-3PAPISID | H1k8LsLZRQ7SMEh1/AzOyDZrKp7m4zLwgu |
| YSC | Qa89eWAzPj4 |
| VISITOR_INFO1_LIVE | Bmm06WRhKfc |
| LOGIN_INFO | AFmmF2swRQIgEcaVoysH-_I81oByopvwilVds_1Evo5J8lw4QtTGFGQCIQCUttWu8UArfuiDScfmsZI2-KUOM_HkEPqW2Z2tCFPdmA:QUQ3MjNmeHdqc0ZXekM3ZE51dHAtTmpsdV9pOEYzZVR3a3FsZWNrUjV5TlhPZC0wbDMzNXBUeWJSc054SERoWXlKNGlQdGxQRWNGSXV4U3lQZDVGVnJPWGlCUGVCWDJINzhEUWlMZVMwSDZmVWdyM3RQWFVvRmRMbm52ckxuWTJPaWdzWWlIN1hBSWVoNnhHand5aVVjSWw3QUJ6em9heUdn |
| __Secure-3PSIDCC | APoG2W97OsBjRKzOMy7kuOvnalCLrXTT3AS2CAdMB5p_tPMQYmTmL5buKr16hqNF1le7FAOR |

50. As shown above, the "user-agent" header, as well as the "userAgent" parameter in the request body, corresponds to the device, browser, and operating system that the user has used to access the Website.

51. As further shown above, the Website causes the user's browser to send to Google the user's connection type. In the example above, the connection type was "CONN_CELLULAR_4G," indicating that the user was utilizing a cellular hotspot to access the Website.

52. The "YSC" and the cookies beginning with "__Secure-3P…" are tracking cookies utilized by Google to build a profile of Website's visitors' interests to show relevant and personalized ads through retargeting. [8]

53. In addition, the data sent to Google contains the user's IP address—which can be used to determine a user's geolocation, including whether they are located in California.

54. Because Google's cookies operate across multiple sites (i.e., cross-site tracking), the cookie causes Google to track users as they navigate from one site to another, and to comprehensively observe and evaluate user behavior online. Google's advertising platform aggregates user data to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics and audience segments based on shared traits (such as females, Millennials, Californians, etc.), and to perform targeted advertising and marketing analytics.

55. Thus, the Google cookies used on the Website cause Google to track users' interactions with advertisements to help advertisers understand how users engage with ads across different websites. Further, the user data collected through the cookie enables the delivery of personalized ads based on user interests and behaviors. For instance, if a user frequently visits travel-related websites, Google will show her more travel-related advertisements. Further, the collected data is used to generate reports for advertisers, helping them assess the performance of their ad campaigns and make data-driven decisions (such as renaming their products). Further, Google's advertising platform enables advertisers to retarget marketing, which Google explains allows advertisers to "show previous visitors ads based on products or services they viewed on your website. With messages tailored to your audience, dynamic remarketing helps you build leads and sales by bringing previous visitors back to your website to complete what they started."[9]

---

[8] *See, e.g.*, https://engineering.fb.com/privacy/ (confirming that the Google "__Secure-3P…" cookies are used to store user data and session preferences). *See also* https://policies.google.com/technologies/cookies/embedded?hl=en-US (stating that the "YSC" cookie is used to distinguish a user's requests from other requests made to Google).

[9] Dynamic remarketing for web setup guide (available at https://support.google.com/google-ads/answer/6077124).

56. Further, in its "How Google Uses Cookies" policy document, Google explains that it uses cookies to detect and resolve problems with its services.[10] Thus, Google has the capability to use the data it collects for understanding online behavior and trends, machine learning, and improving its own products and services.

**2. Adobe Cookies.**

57. Defendant also causes third-party cookies to be transmitted to and from Website users' browsers and devices, even after users elect to decline "ALL" cookies, to and from the **omtrdc.net** domain. This domain is associated with Adobe Inc.'s Audience Manager, a data management platform, Adobe's Marketing Cloud, and Adobe's Experience Cloud Identity Service, a service which provides a universal, persistent ID to identify visitors across all Adobe products.

58. These cookies are used to assign a unique identifier to each site visitor, which enables Adobe to consistently recognize and track users across different sessions and domains (i.e., cross-site tracking) and collect and synchronize user data to comprehensively observe and evaluate user behavior online.[11] These cookies enable Adobe to obtain and store at least the following user data: (i) user identifier; (ii) website interactions; (iii) browsing history; (iv) visit history; (v) interests and preferences; and (vi) session information.[12]

59. Adobe aggregates this cookie data with other data from multiple channels and devices, including web analytics, CRM systems, and e-commerce platforms, to create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics, create audience segments based on shared traits (such as millennials, tech enthusiasts, etc.), and to enable targeted advertising and marketing analytics.[13]

---

[10] *See* How Google uses cookies (available at https://policies.google.com/technologies/cookies/embedded?client_theme=dark).

[11] *See, e.g.,* Adobe Experience League: Adobe Analytics cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics); *see also* Adobe Experience League: Audience Manager cookies (available at https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager).

[12] *See, e.g.,* Adobe Audience Manager User Guide: Data Collection Components (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/system-components/components-data-collection).

[13] *See, e.g.*, Adobe Audience Manager User Guide: Understanding Calls to the Demdex Domain (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/reference/demdex-calls); Adobe

60. For example, the Adobe software code that Defendant causes to be stored on and executed by the Website user's device causes the following data to be sent to Adobe's domain, at omtrdc.net:


```
▾Query String Parameters     view source     view decoded
  client: mazdamotorofamerica
  sessionId: 7d186898b20349a49a6c479fad24a014
  version: 2.5.0

▾Request Payload     view source
 ▾ {requestId: "2a20268101ba4dddb363f7a17640de71", context: {,…},…}
  ▸ context: {,…}
  ▸ execute: {pageLoad: {,…}}
  ▾ experienceCloud: {audienceManager: {locationHint: 9, blob: "RKhpRz8krg2tLO6pguXWp5olkAcUniQYPHaMWWgdJ3xzPWQmdj0y"},…}
   ▾ analytics: {logging: "server_side", supplementalDataId: "7FF0FB7A9BA377FC-5B514C9E6305F141"}
     logging: "server_side"
     supplementalDataId: "7FF0FB7A9BA377FC-5B514C9E6305F141"
   ▾ audienceManager: {locationHint: 9, blob: "RKhpRz8krg2tLO6pguXWp5olkAcUniQYPHaMWWgdJ3xzPWQmdj0y"}
     blob: "RKhpRz8krg2tLO6pguXWp5olkAcUniQYPHaMWWgdJ3xzPWQmdj0y"
     locationHint: 9
  ▾ id: {tntId: "7d186898b20349a49a6c479fad24a014.35_0",…}
    marketingCloudVisitorId: "36320202667876851631523451903849517345"
    tntId: "7d186898b20349a49a6c479fad24a014.35_0"
  ▾ prefetch: {views: [{,…}]}
   ▾ views: [{,…}]
    ▾ 0: {,…}
     ▸ parameters: {eVar22: "Unengaged", owner: "false", vehicleID: "c30", modelYear: "2024", trimCode: "",…}
     ▾ profileParameters: {journeyState: "Unengaged", vehicleID: "c30", modelYear: "2024", trimCode: "", digitalRetail: "false",…}
       ASAudience: ""
       ASBadges: "5602|5606"
       channel: "Refering Domains"
       digitalRetail: "false"
       digitalRetailDealer: "true"
       journeyState: "Unengaged"
       modelYear: "2024"
       trimCode: ""
       vehicleID: "c30"
   requestId: "2a20268101ba4dddb363f7a17640de71"
```


61. The data indicates that the user is viewing a 2024 vehicle with id "c30" (referring to the Mazda CX-30). The data also has the "marketingCloudVisitorId," which, according to Adobe documentation, "is a universal and persistent ID that identifies [the website's] visitors across all solutions in [Adobe's] Experience Cloud."[14]

62. In addition, the Website causes the "s_vi" cookie to be sent to Adobe. According to Adobe documentation, the "s_vi" cookie "[s]tores a unique visitor ID and timestamp."[15] "Each visitor ID is associated with a visitor profile on Adobe servers," and visitor profiles are set to persist for one year.[16]

---

Experience Cloud Identity Service overview (available at https://experienceleague.adobe.com/en/docs/id-service/using/intro/overview); Adobe Audience Manager Features (available at https://business.adobe.com/products/audience-manager/features.html); *see also* Audience Manager Overview (available at https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview).

[14] https://experienceleague.adobe.com/en/docs/target-dev/developer/api/delivery-api/identifying-visitors.

[15] https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/analytics.

[16] *Id.*

63. Further, along with all of this data, the Adobe software code that Defendant causes to be stored on and executed by the user's device causes the user's "user-agent" information to be sent to Adobe, along with the user's IP address. As discussed above with respect to Google, this enables Adobe to determine the user's device, browser, operating system, and geolocation, including whether the user is located in California.

**D. The Third Parties Intercept User Communications While in Transit.**

64. On information and belief, the Third Parties intercept user communications while those communications are in transit from consumers' browsers to Defendant's Website. The Third Parties operate large-scale data ingestion systems designed to receive, read, and act upon incoming data streams in real time, as the data is transmitted over the network, before it is committed to storage. As the user data is transmitted over the wire, it is transmitted as a raw payload that cannot be used until the Third Party reads and processes it using at least the steps described below. These steps necessarily require contemporaneous access to the contents of the communications while they are in transit.

65. First, the Third Parties must read the data in real time in order to ***transform*** it into a usable format for subsequent processing. Transforming, for example, may involve converting long html-encoded strings and decoding them to a format such as Unicode Transformation Format, which is more amenable to subsequent processing.

66. Second, the Third Parties read the data in real time in order to ***deduplicate*** events transmitted through multiple channels. Most websites transmit the same user interaction twice: both directly from the user's device and separately through a server-to-server API, to ensure reliability.[17] Third Party platforms encourage this redundant configuration and automatically compare identifiers contained within the transmitted data—such as event identifiers and device identifiers—to determine whether multiple transmissions correspond to the same user action. This deduplication occurs as the communications are received, before they are stored.

[17] For example, Google's server-to-server API is the **Google Ads API**. On information and belief, Adobe also uses a server-to-server API to collect user data.

67. Third, the Third Parties read and analyze incoming communications in real time to ***validate*** and ***filter*** the data, including to detect invalid, malicious, or anomalous transmissions and to determine whether the data complies with internal processing rules. These determinations must be made immediately upon receipt of the communication in order for the Third Parties' systems to function.

68. Fourth, the Third Parties perform real-time ***analytics*** on user communications to determine their meaning and significance. This processing is used to interpret the data, associate it with particular users or devices, and to determine what real-time events or actions should be taken in response, such as triggering advertising delivery, notifications, or other automated responses. This step typically involves applying artificial intelligence and machine learning algorithms to the data. These determinations occur while the data is in motion, prior to final storage.

69. To accomplish each of the functions described above, the Third Parties employ real-time stream processing platforms specifically designed to operate on data "in flight"—that is, after it is transmitted from a user's browser but before it is committed to the Third Parties' storage. Examples of such platforms include Apache Flink, Kafka, and Amazon Kinesis. Industry documentation confirms that these systems are designed to read, transform, analyze, and act upon data streams as they are received.

70. On information and belief, the Third Parties also use ingest-phase processing platforms that perform real-time analytics and filtering on incoming data streams before storage. For example, Google developed MillWheel, an internal stream processing system, as well as Flume/FlumeJava, which evolved into Google Cloud Dataflow.[18] Google Cloud Dataflow enables Google to perform many functions on real-time data at the "Ingest" phase, before it is stored.[19] Google, which sells Dataflow to third party developers for use with their own products, states that Dataflow is used "to create data pipelines that read from one or more sources,

[18] *See, e.g.*, Google Cloud Blog, "How cloud batch and stream data processing works" (August 2020), https://cloud.google.com/blog/products/data-analytics/how-cloud-batch-and-stream-data-processing-works.
[19] Google Cloud Blog, "BigQuery explained: An overview of BigQuery's architecture" (September 2, 2020), https://cloud.google.com/blog/products/data-analytics/new-blog-series-bigquery-explained-overview.

***transform the data***, and write the data to a destination."[20] One use for Dataflow is the "[r]eal-time machine learning (ML) analysis of streaming data."[21] Google confirms that Dataflow is "suitable for more advanced applications, such as real-time streaming analytics."[22]

71. Accordingly, the Third Parties' platforms do not operate as passive recipients that merely record user communications. Instead, they function as active interceptors that contemporaneously read and process the contents of user communications—including the Private Communications—by transforming, deduplicating, validating and filtering and analyzing in real time while those communications are in transit between the user's browser and Defendant's Website.

**E. The Signaling and Addressing Information Intercepted by the Third Parties.**

72. The "signaling" and "addressing" information captured and recorded by the Third Parties includes TCP and/or UDP port numbers associated with outgoing communications initiated by Plaintiffs' and Class/Subclass members' browsers and devices. In the context of Internet Protocol (IP) networking, port numbers function as sub-addresses that direct traffic to specific software processes. By recording these port numbers, the Third Parties identify and distinguish specific network connections and the communicating endpoints involved (e.g., a Plaintiff's or Class/Subclass member's IP address and TCP/UDP source port communicating with a Third Party's destination IP address and destination port such as 443). These port numbers constitute addressing information associated with the communications initiated by Plaintiffs' and Class/Subclass members' browsers and devices and fall within the "instruments" and "facilities" contemplated by California Penal Code § 638.50(b).

73. The "signaling" information also includes protocol-level metadata recorded by the Third Parties during connection establishment and session management, such as the initiation and acceptance of TCP connections and the TLS handshake and negotiation metadata used to establish HTTPS sessions. This signaling information is transmitted by Plaintiffs' and

[20] Google Cloud Documentation, "Dataflow overview," https://docs.cloud.google.com/dataflow/docs/overview (emphasis added).
[21] *Id.*
[22] *Id.*

Class/Subclass members' devices to initiate, coordinate, and manage electronic communications with the Third Parties. Because this metadata enables management of the connection rather than the substance of the message, it constitutes record information regarding the characteristics of the communication, rather than communication content, and falls squarely within the statutory definition of a pen register.

74. Additionally, the Third Parties record HTTP request header metadata, such as the "Host" header and connection-management headers (e.g., "Connection" in HTTP/1.1), which function as digital "dialing" information. Just as a traditional pen register records the number dialed to reach a destination, these headers identify the intended web origin (via "Host") and specify how the client requests the connection be handled for that request (e.g., whether to keep the connection open). This header information is transmitted as part of the Plaintiffs' and Website users' HTTP requests and, together with the destination network address and port, enables the receiving Third Party to identify and log the destination and handling characteristics of Plaintiffs' and Website users' communications, separate from any underlying user input or message content.

75. Finally, the Third Parties' receiving infrastructure (e.g., servers, edge services, and/or load balancers) observes and records network-level and transport-level routing and addressing metadata associated with communications initiated by Plaintiffs' and Website users' browsers and devices. This metadata includes destination IP addresses, port identifiers (such as 443 for HTTPS), and related connection and session attributes, including connection initiation and termination timestamps, connection duration, and identifiers such as the protocol used (TCP or UDP), the source IP address, the source port, the destination IP address, and the destination port. The Third Parties use this information in real time to identify and log the origin and destination endpoints of Plaintiffs' and Website users' electronic communications and the characteristics of those connections, separate from any substantive "message" or "contents" carried at the higher-level Application layer.

**F. The Private Communications Collected are Valuable.**

76. As part of its regular course of business, Defendant targets California consumers by causing the Third Parties to extract, collect, maintain, distribute, and exploit for Defendant's and the Third Parties' profit all of the Private Communications transferred by the cookies which Defendant causes to be placed on Plaintiffs' and other California Website users' devices without their knowledge or consent. Defendant knew the location of consumers like Plaintiffs and the Class/Subclass members either prior to or shortly after causing the Third Parties to use cookies on their devices.

77. The Private Communications tracked and collected through cookies on the Website are valuable to Defendant and the Third Parties. Defendant uses this data to measure and optimize marketing campaigns, evaluate website design and product placement, and target specific users or groups of users with advertising. For example, Defendant can identify California users who visit webpages related to particular motor vehicles and then target those users with advertisements for similar products both on the Website and across unrelated third-party websites.

78. Data reflecting users' browsing activity allows Defendant to identify behavioral patterns, preferences, and interests relating to Defendant's products. At scale, this data enables Defendant to assess trends across its products and within the broader motor vehicle market. Defendant monetizes this data by leveraging it to increase user engagement, advertising effectiveness, and overall revenue.

79. The value of the Private Communications tracked and collected by the Third Parties using cookies on the Website can be quantified. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium."[23] Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id*. "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id*.

[23] *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004).

80. Numerous empirical studies quantify the appropriate value measure for personal data. Generally, the value of personal data is measured as either the consumer's willingness to accept compensation to sell her data or the consumer's willingness to pay to protect her information.

81. By falsely representing consumers' ability to "DECLINE ALL" cookies, and by aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties to collect users' Private Communications, Defendant unjustly enriches itself at the expense of consumer privacy and autonomy. Defendant deprives consumers of the ability to decide whether, and on what terms, their data may be monetized.

**PLAINTIFFS' EXPERIENCES**

**Plaintiff Vishal Shah**

82. Plaintiff Shah visited the Website to seek and obtain information about Mazda's products, while located in California, on multiple occasions during the last four years, including in or around March 2022, January 2023, March 2023, and October 2024. Plaintiff Shah visited the Website while researching a new vehicle to purchase and was particularly interested in Mazda CX-series vehicles, including available hybrid models.

83. Plaintiff Shah's visits to the Website were consistent with an ordinary Website user's visits researching and evaluating a potential vehicle purchase. During his visits, Plaintiff Shah reviewed Mazda CX-series vehicles, compared vehicles and available options, reviewed offers, searched available vehicle inventory, and used the Website's "Find a Dealer" and other shopping tools. Plaintiff Shah also entered his ZIP code into the Website's vehicle-inventory search functionality to obtain information regarding vehicles and Mazda dealers available in his geographic area. Plaintiff Shah is not a consumer advocate, "tester," or compliance auditor who visited the Website to test or evaluate Defendant's privacy practices.

84. When Plaintiff Shah visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "DECLINE ALL" button. Plaintiff Shah viewed Defendant's representation on the popup cookie consent banner that, "We use technologies to personalize

and enhance your experience on our site…If you agree to our use of these technologies, please select I AGREE below." Plaintiff Shah also viewed Defendant's additional representation that, rather than agreeing to the use of such cookies and technologies, users could instead select "DECLINE ALL."

85. Plaintiff Shah selected and clicked the "DECLINE ALL" button. Plaintiff Shah believed that selecting the "DECLINE ALL" button on the popup cookie consent banner found on the Website would allow him to opt out of, decline, and/or reject "ALL" cookies and other tracking technologies (inclusive of those cookies and technologies that personalize and enhance the user experience on the Website).

86. In selecting the "DECLINE ALL" button, Plaintiff Shah gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Shah specifically declined, based on Defendant's representations, those cookies used to "personalize and enhance [his] experience on [Defendant's] site" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Shah continue browsing the Website.

87. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, to be placed on Plaintiff Shah's device and/or intercepted by the Third Parties along with user data, without Plaintiff Shah's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Shah that he could decline the use and/or placement of "ALL" cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Shah believe, he did not have a choice about whether third-party cookies would be placed on his device and/or intercepted by the Third Parties along with his user data; rather, Defendant had already caused that to happen.

88. Then, as Plaintiff Shah continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Shah's clear declination of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user

data, including those involved in providing personalized content from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Shah's Private Communications as Plaintiff Shah browsed the Website.

89. Defendant's representations that consumers could "DECLINE ALL" cookies and tracking technologies while Plaintiff Shah and users browsed the Website, or at least those involved in providing personalized content, were untrue. Had Plaintiff Shah known this fact, he would not have used the Website. Moreover, Plaintiff Shah reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline "ALL" cookies, Plaintiff Shah would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

90. Plaintiff Shah continues to desire to browse content featured on the Website. Plaintiff Shah would like to browse websites that do not misrepresent that users can decline "ALL" cookies and tracking technologies. If the Website were programmed to honor users' requests to decline "ALL" cookies and tracking technologies, Plaintiff Shah would likely browse the Website again in the future, but will not do so until then. Plaintiff Shah regularly visits websites that feature content similar to that of the Website. Because Plaintiff Shah does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to decline "ALL" cookies and tracking technologies, Plaintiff Shah will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is intercepted by third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Shah is not a software developer and has not received training with respect to HTTP network calls.

**Plaintiff Brian Heinz**

91. Plaintiff Heinz visited the Website to seek and obtain information about Mazda's products, while located in California, on one or more occasions during the last four years, including September, October, and November 2024. In particular, Plaintiff Heinz visited the Website to research the Mazda CX-50, review available models and trim levels, evaluate vehicle features and specifications, compare fuel-economy information, and determine the availability of vehicles, including hybrid models, in his geographic area. Plaintiff Heinz reviewed the Website's CX-50 model and specifications pages, fuel-economy and technical information, and regional inventory and availability information.

92. Plaintiff Heinz's visits to the Website were consistent with an ordinary Website user's visits seeking information about Defendant's products and evaluating a potential vehicle purchase. Plaintiff Heinz used the Website's interactive features to obtain information relevant to his interests, including by entering his ZIP code into the Website's inventory-locator tool to identify vehicles and dealer inventory available in his geographic area. Plaintiff Heinz also entered his contact information into the Website's "Stay Informed" or similar updates form to receive information regarding future CX-50 announcements and hybrid availability. Plaintiff Heinz is not a consumer advocate, "tester," or compliance auditor who visited the Website to test or evaluate Defendant's privacy practices.

93. When Plaintiff Heinz visited the Website, it immediately detected that he was a visitor in California and presented him with Defendant's popup cookie consent banner, which provided the option to select the "DECLINE ALL" button. Plaintiff Heinz viewed Defendant's representation on the popup cookie consent banner that, "We use technologies to personalize and enhance your experience on our site…If you agree to our use of these technologies, please select I AGREE below." Plaintiff Heinz also viewed Defendant's additional representation that, rather than agreeing to the use of such cookies and technologies, users could instead select "DECLINE ALL."

94. Plaintiff Heinz selected and clicked the "DECLINE ALL" button. Plaintiff Heinz believed that selecting the "DECLINE ALL" button on the popup cookie consent banner found

on the Website would allow him to opt out of, decline, and/or reject "ALL" cookies and other tracking technologies (inclusive of those cookies and technologies that personalize and enhance the user experience on the Website).

95. In selecting the "DECLINE ALL" button, Plaintiff Heinz gave Defendant notice that he did not consent to the use or placement of cookies and tracking technologies while browsing the Website. Further, Plaintiff Heinz specifically declined, based on Defendant's representations, those cookies used to "personalize and enhance [his] experience on [Defendant's] site" and share information with third parties. In reliance on these representations and promises, only then did Plaintiff Heinz continue browsing the Website.

96. Even before the popup cookie consent banner appeared on the screen, Defendant nonetheless caused cookies and tracking technologies, including those used for personalized content, to be placed on Plaintiff Heinz's device and/or intercepted by the Third Parties along with user data, without Plaintiff Heinz's knowledge. Accordingly, the popup cookie consent banner's representation to Plaintiff Heinz that he could decline the use and/or placement of "ALL" cookies and tracking technologies while he browsed the Website was false. Contrary to what Defendant made Plaintiff Heinz believe, he did not have a choice about whether third-party cookies would be placed on his device and/or intercepted by the Third Parties along with his user data; rather, Defendant had already caused that to happen.

97. Then, as Plaintiff Heinz continued to browse the Website in reliance on the promises Defendant made in the cookie consent banner, and despite Plaintiff Heinz's clear declination of the use and/or placement of such cookies and tracking technologies, Defendant nonetheless continued to cause the placement and/or transmission of cookies along with user data, including those involved in providing personalized content from the Third Parties on his device. In doing so, Defendant permitted the Third Parties to track and collect Plaintiff Heinz's Private Communications as Plaintiff Heinz browsed the Website.

98. Defendant's representations that consumers could "DECLINE ALL" cookies and tracking technologies while Plaintiff Heinz and users browsed the Website, or at least those involved in providing personalized content, were untrue. Had Plaintiff Heinz known this fact, he

would not have used the Website. Moreover, Plaintiff Heinz reviewed the popup cookie consent banner prior to using the Website. Had Defendant disclosed that it would continue to cause cookies and tracking technologies to be stored on consumers' devices even after they choose to decline "ALL" cookies, Plaintiff Heinz would have noticed it and would not have used the Website or, at a minimum, he would have interacted with the Website differently.

99. Plaintiff Heinz continues to desire to browse content featured on the Website. Plaintiff Heinz would like to browse websites that do not misrepresent that users can decline "ALL" cookies and tracking technologies. If the Website were programmed to honor users' requests to decline "ALL" cookies and tracking technologies, Plaintiff Heinz would likely browse the Website again in the future, but will not do so until then. Plaintiff Heinz regularly visits websites that feature content similar to that of the Website. Because Plaintiff Heinz does not know how the Website is programmed, which can change over time, and because he does not have the technical knowledge necessary to test whether the Website honors users' requests to decline "ALL" cookies and tracking technologies, Plaintiff Heinz will be unable to rely on Defendant's representations when browsing the Website in the future absent an injunction that prohibits Defendant from making misrepresentations on the Website. The only way to determine what network traffic is intercepted by third parties when visiting a website is to use a specialized tool such as Chrome Developer Tools. As the name suggests, such tools are designed for use by "developers" (i.e., software developers), whose specialized training enables them to analyze the data underlying the HTTP traffic to determine what data, if any, is being sent to whom. Plaintiff Heinz is not a software developer and has not received training with respect to HTTP network calls.

## CLASS ALLEGATIONS

100. Plaintiffs bring this Class Action Complaint on behalf of themselves and a proposed Class and Subclass of similarly situated persons, pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiffs seek to represent the following group of similarly situated persons, defined as follows:

**Class**: All persons who browsed the Website in the United States after clicking or selecting the "DECLINE ALL" button in the cookie consent banner.

**Subclass**: All persons who browsed the Website in the State of California after clicking or selecting the "DECLINE ALL" button in the cookie consent banner.

101. This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed Class and Subclass are easily ascertainable.

102. **Numerosity:** Plaintiffs do not know the exact size of the Class and Subclass, but they estimate that they are composed of more than 100 persons. The persons in the Class and Subclass are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

103. **Common Questions Predominate:** This action involves common questions of law and fact to the Class and Subclass because each class/subclass member's claim derives from the same unlawful conduct that led them to believe that Defendant would not cause third-party cookies to be placed on their browsers and devices and/or intercepted by third parties along with user data, after Class and Subclass members chose to decline "ALL" cookies and tracking technologies on the Website, nor would Defendant permit third parties to track and collect Class and Subclass members' Private Communications as they browsed the Website.

104. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class and Subclass to recover. The questions of law and fact common to the Class and Subclass are:

a. Whether Defendant's actions violate California laws invoked herein; and

b. Whether Plaintiffs, Class, and Subclass members are entitled to damages, restitution, injunctive and other equitable relief, reasonable attorneys' fees, prejudgment interest and costs of this suit.

105. **Typicality:** Plaintiffs' claims are typical of the claims of the other members of the Class and Subclass because, among other things, Plaintiffs, like the other Class and Subclass

members, visited the Website, declined "ALL" cookies, and had their confidential Private Communications intercepted by the Third Parties.

106. **Adequacy of Representation:** Plaintiffs will fairly and adequately protect the interests of all Class and Subclass members because it is in their best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests in conflict with, or antagonistic to, the interests of Class and Subclass members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the Class and Subclass. By prevailing on their claims, Plaintiffs will establish Defendant's liability to all Class and Subclass members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the Class and Subclass members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class and Subclass members.

107. **Superiority:** There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Class and Subclass will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of Class and Subclass members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the Class and Subclass may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

**First Cause of Action: Invasion of Privacy (on behalf of the Class)**

108. Plaintiffs reallege and incorporate the paragraphs of this Complaint as if set forth herein.

109. To plead an invasion of privacy claim, Plaintiffs must show (i) an invasion of a legally protected privacy interest; (ii) a reasonable expectation of privacy in the circumstances; and (iii) conduct by Defendant constituting a serious invasion of privacy.

110. Defendant has intruded upon the following legally protected privacy interests of Plaintiffs and Class members: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Plaintiffs' and Class members' Fourth Amendment right to privacy.

111. Plaintiffs and Class members had a reasonable expectation of privacy under the circumstances, as Defendant affirmatively promised users they could "DECLINE ALL" cookies and tracking technologies before proceeding to browse the Website. Plaintiffs and other Class members directed their electronic devices to access the Website and, when presented with the popup cookies consent banner on the Website, Plaintiffs and Class members chose to "DECLINE ALL" cookies and reasonably expected that their declination of "ALL" cookies and tracking technologies would be honored. That is, they reasonably believed that Defendant would not permit the Third Parties to store and send cookies and/or use other such tracking technologies on their devices while they browsed the Website. Plaintiffs and Class members also reasonably expected that, if they declined such cookies and/or tracking technologies, Defendant would not permit the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, on the Website.

112. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140(v)(1)(F).

113. Defendant, in violation of Plaintiffs' and other Class members' reasonable expectation of privacy and without their consent, permits the Third Parties to use cookies and other tracking technologies to collect, track, and compile users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California. The data that Defendant allowed Third Parties to collect enables the Third Parties to (and they in fact do), *inter alia*, create consumer profiles containing detailed information about a consumer's behavior, preferences, and demographics; create audience segments based on shared traits (such as Millennials, Californians, tech enthusiasts, etc.); and perform targeted advertising and marketing analytics. Further, the Third Parties share user data and/or the user profiles to unknown parties to further their financial gain. The consumer profiles are and can be used to further invade Plaintiffs' and users' privacy, by allowing third parties to learn intimate details of their lives, and target them for advertising and other purposes, as described herein, thereby harming them through the abrogation of their autonomy and their ability to control dissemination and use of information about them.

114. Defendant's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

115. Defendant's intrusion into Plaintiffs' privacy was also highly offensive to a reasonable person.

116. Defendant lacked a legitimate business interest in causing the placement and/or transmission of third-party cookies along with user data that allowed the Third Parties to track,

intercept, receive, and collect Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, without their consent.

117. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

118. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

119. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, or willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Website's use of "ALL" cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Second Cause of Action: Intrusion Upon Seclusion (on behalf the Class)**

120. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

121. To assert a claim for intrusion upon seclusion, Plaintiffs must plead (i) that Defendant intentionally intruded into a place, conversation, or matter as to which Plaintiffs had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

122. By permitting third-party cookies to be stored on consumers' devices without consent, which caused the Third Parties to track and collect Plaintiffs' and Class members' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, in violation of Defendant's representations otherwise in the popup cookie consent banner, Defendant intentionally intruded upon the solitude or seclusion of Website users. Defendant

effectively placed the Third Parties in the middle of communications to which they were not invited, welcomed, or authorized.

123. The Third Parties' tracking and collecting of Plaintiffs' and Class members' Private Communications on the Website using third-party cookies that Defendant caused to be stored on users' devices—and to be intercepted by Third Parties—was not authorized by Plaintiffs and Class members, and, in fact, those Website users specifically chose to "DECLINE ALL" cookies and tracking technologies.

124. Plaintiffs and the Class members had an objectively reasonable expectation of privacy surrounding their Private Communications on the Website based on Defendant's promise that users could "DECLINE ALL" cookies and tracking technologies, as well as state criminal and civil laws designed to protect individual privacy.

125. Defendant's intentional intrusion into Plaintiffs' and other users' Private Communications would be highly offensive to a reasonable person given that Defendant represented that Website users could "DECLINE ALL" cookies and tracking technologies, when, in fact, Defendant caused such Third Party cookies to be stored on consumers' devices and browsers, and to be intercepted by third parties, even when consumers declined all such cookies. Indeed, Plaintiffs and Class members reasonably expected, based on Defendant's false representations, that when they declined "ALL" cookies and tracking technologies, Defendant would not cause such third-party cookies to be stored on their devices or permit the Third Parties to obtain their Private Communications on the Website, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

126. Defendant's conduct was intentional and intruded on Plaintiffs' and users' Private Communications on the Website.

127. Plaintiffs and Class members have been damaged by Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

128. Plaintiffs and Class members seek appropriate relief for that injury, including but not limited to, damages that will compensate them for the harm to their privacy interests as well as disgorgement of profits made by Defendant as a result of its intrusions upon Plaintiffs' and Class members' privacy.

129. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, or willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Website's use of "ALL" cookies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**Third Cause of Action: Wiretapping in Violation of the California Invasion of Privacy Act (California Penal Code § 631) (on behalf the Subclass)**

130. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

131. California Penal Code § 631(a) provides, in pertinent part:

> "Any person [i] who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or [ii] [who] in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [iii] who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or [iv] who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

132. Defendant is a "person" within the meaning of California Penal Code § 631.

133. The Third Parties' cookies—as well as the software code of the Third Parties responsible for placing the cookies and transmitting data from user devices to the Third Parties—constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA (and, even if they do not, Defendant's deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of "any other manner").

134. Each of the Third Parties is a separate legal entity that offers a software-as-a-service and not merely a passive device. Further, the Third Parties had the capability to use the wiretapped information for their own purposes and, as alleged above, they did in fact use the

wiretapped information for their own business purposes. Accordingly, the Third Parties were third parties to any communication between Plaintiffs and Subclass members, on the one hand, and Defendant, on the other.

135. Under § 631(a), Defendant must show it had the consent of all parties to a communication.

136. At all relevant times, the Website caused Plaintiffs and Subclass members' browsers to store the Third Parties' cookies and to transmit those cookies alongside Private Communications—including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—to the Third Parties without Plaintiffs' and Subclass members' consent. By configuring the Website in this manner, Defendant willfully aided, agreed with, employed, permitted, or otherwise caused the Third Parties to wiretap Plaintiffs and Subclass members using the Third Parties' cookies and to accomplish the wrongful conduct alleged herein.

137. At all relevant times, by their cookies and corresponding software code, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiffs and Subclass members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

138. The Private Communications of Plaintiffs and Subclass members, on the one hand, and Defendant, on the other, that the Third Parties automatically intercepted directly communicate the Website user's affirmative decisions, actions, choices, preferences, and activities, which constitute the "contents" of electronic communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data—including whether a user is located in California.

139. At all relevant times, the Third Parties used or attempted to use the Private Communications automatically intercepted by their cookie tracking technologies for their own purposes.

140. Plaintiffs and Subclass members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiffs' and Subclass members' electronic communications. Nor did Plaintiffs and Subclass members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct. On the contrary, Plaintiffs and Subclass members expressly declined to allow Third Parties' cookies and tracking technologies to access, intercept, read, learn, record, collect, and use Plaintiffs' and Subclass members' electronic communications by choosing to decline "ALL" cookies and tracking technologies in the consent banner.

141. The wiretapping of Plaintiffs and Subclass members occurred in California, where Plaintiffs and Subclass members accessed the Website and where the Third Parties—as caused by Defendant—routed Plaintiffs' and Subclass members' electronic communications to Third Parties' servers. Among other things, the cookies, as well as the software code responsible for placing the cookies and transmitting them and other Private Communications to the Third Parties, resided on Plaintiffs' California-located devices. In particular, the user's California-based device, after downloading the software code from the Third Parties' servers, (i) stored the code onto the user's disk; (ii) converted the code into machine-executable format; and (iii) executed the code, causing the transmission of data (including cookie data) to and from the Third Parties.

142. Plaintiffs and Subclass members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy, (ii) loss of value in their Private Communications, (iii) damage to and loss of Plaintiffs' and Subclass members' property right to control the dissemination and use of their Private Communications, and (iv) loss of their Private Communications to the Third Parties without their consent.

143. Pursuant to California Penal Code § 637.2, Plaintiffs and Subclass members have been injured by the violations of California Penal Code § 631, and each seeks statutory damages of the greater of $5,000, or three times the amount of actual damages, for each of Defendant's violations of CIPA § 631(a), as well as injunctive relief.

144. Unless enjoined, Defendant will continue to commit the illegal acts alleged herein including, but not limited to, permitting Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Subclass members' electronic Private Communications with Defendant. Plaintiffs, Subclass members, and the general public continue to be at risk because Plaintiffs, Subclass members, and the general public frequently use the internet to search for information and content related to motor vehicles and related products. Plaintiffs, Subclass members, and the general public continue to desire to use the internet for that purpose. Plaintiffs, Subclass members, and the general public have no practical way to know if their request to decline "ALL" cookies and tracking technologies will be honored and/or whether Defendant will permit third parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Subclass members' electronic Private Communications with Defendant. Further, Defendant has already permitted the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Subclass members' electronic Private Communications with Defendant and will continue to do so unless and until enjoined.

**<u>Fourth Cause of Action</u>: Use of a Pen Register in Violation of the California Invasion of Privacy Act (California Penal Code § 638.51) (on behalf of the Subclass)**

145. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

146. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

147. California Penal Code Section 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

148. A "pen register" is a "device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication." Cal. Penal Code § 638.50(b).

149. The Third Parties' cookies and the corresponding software code installed by Defendant on its Website are each "pen registers" because they are "device[s] or process[es]" that record or decode the "routing, addressing, or signaling information"—including, the IP address and user-agent information—from the electronic communications transmitted by Plaintiffs' and the Subclass members' computers or devices. Cal. Penal Code § 638.50(b).

150. At all relevant times, Defendant caused pen registers (e.g., the Third Party software code and cookies) to be placed on Plaintiffs' and Subclass members' browsers and devices. This software code established and maintained network connections between the users' devices and the Third Parties, and also caused cookies, user data and metadata, and addressing and networking information (including, without limitation, IP addresses, port numbers, protocol-level metadata, HTTP request header metadata, and user-agent information), to be intercepted by the Third Parties.

151. Some of the information collected by the Third Parties' cookies and the corresponding software, including IP addresses and user-agent information, does not constitute the content of Plaintiffs' and the Subclass members' electronic communications with the Website.

152. Plaintiffs and Subclass members did not provide their prior consent to Defendant's use of third-party cookies and the corresponding software. On the contrary, Plaintiffs and the Subclass members informed Defendant that they did not consent to the Website's use of third-party cookies by clicking or selecting the "DECLINE ALL" button in the cookie consent banner.

153. Defendant did not obtain a court order to install or use the third-party cookies and corresponding software to track and collect Plaintiffs' and Subclass members' IP addresses and user-agent information.

154. As a direct and proximate result of Defendant's conduct, Plaintiffs and Subclass members suffered losses and were damaged in an amount to be determined at trial.

155. Pursuant to Penal Code § 637.2(a)(1), Plaintiffs and Subclass members are also entitled to statutory damages of $5,000 for each of Defendant's violations of § 638.51(a).

**Fifth Cause of Action: Common Law Fraud, Deceit and/or Misrepresentation (on behalf of the Class)**

156. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

157. Defendant fraudulently and deceptively informed Plaintiffs and Class members that they could "DECLINE ALL" cookies and tracking technologies.

158. However, despite Defendant's representations otherwise, Defendant caused third-party cookies and software code to be stored on consumers' devices, and to be intercepted by the Third Parties alongside Private Communications, even after users clicked or selected the "DECLINE ALL" button in the popup cookie consent banner. These cookies and corresponding software code allowed the Third Parties to access, intercept, read, learn, record, collect, and use Plaintiffs' and Class members' Private Communications, even when consumers had previously chosen to "DECLINE ALL" cookies and tracking technologies.

159. Defendant affirmatively chose to deploy a cookie consent banner governing the collection, sharing, and use of users' Private Communications on the Website.

160. By implementing the cookie banner, Defendant undertook responsibility for ensuring that the banner accurately communicated users' privacy choices and properly effectuated those choices.

161. Defendant and/or its agents configured and managed which technologies loaded and transmitted data before and after a user disabled third party cookies, including through consent management settings and/or platforms, tag-management rules, and related implementation choices under Defendant's control. On information and belief, Defendant

operated, controlled, configured, approved, or maintained settings that permitted the Third Parties' tracking technologies to continue collecting users' Private Communications even after users selected options indicating their choice to "DECLINE ALL" cookies and opt out of the collection, use, sale, and/or sharing of their Private Communications.

162. Industry documentation for the consent management platforms and Third Parties' technologies used on the Website explains that website operators, i.e., Defendant, must affirmatively configure consent settings and tag behavior to prevent tracking technologies from firing after users reject cookies. On information and belief, Defendant received, reviewed, or had access to such implementation guidance in deploying the challenged technologies on the Website. On information and belief, Defendant had the ability during the relevant time period to audit, test, configure, disable, or modify, the cookie consent banner, consent-management functionality, and Third-Party tracking technologies operating on the Website. Defendant had information available to it demonstrating that users' purported opt-out selections were not being honored and that users' Private Communications continued to be collected and intercepted by the Third Parties notwithstanding Defendant's contrary representations.

163. Defendant also used the Third Parties' analytics, advertising, and reporting dashboards to monitor Website traffic, user behavior, advertising performance, and related engagement metrics generated through the challenged cookie and tracking technologies. Through these dashboards and related reporting tools, Defendant had access to information reflecting that user data continued to be intercepted and processed by the Third Parties notwithstanding users' purported opt-out selections. Defendant routinely reviewed, monitored, and relied upon data generated through the Third Parties' resources for advertising, analytics, personalization, attribution, and/or website performance purposes.

164. Industry standards, privacy frameworks, and applicable statutes and regulations, including California's California Consumer Privacy Act and related regulations, require website operators deploying cookie consent banners to ensure that consent mechanisms function properly and accurately record and enforce user choices. *See, e.g.*, California Consumer Privacy Rights

Act § 7025(c) (enumerating requirements for businesses that receive an "opt out preference signal."); *id.* § 7101 (business record keeping requirements regarding opt out requests).

165. On information and belief, Defendant either knew its representations regarding users' ability to "DECLINE ALL" cookies and opt out of data sharing were false, lacked any reasonable basis for believing those representations were true, or made those representations carelessly and recklessly despite information available to Defendant demonstrating that users' data continued to be intercepted by the Third Parties after users attempted to opt out.

166. These misrepresentations and omissions were known exclusively to, and actively concealed by Defendant, not reasonably known to Plaintiffs and Class members, and material at the time they were made. Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs and Class members as to whether to use the Website. In misleading Plaintiffs and Class members and not so informing them, Defendant breached its duty to Plaintiffs and Class members. Defendant also gained financially from, and as a result of, its breach.

167. Plaintiffs and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions.

168. Plaintiffs and Class members have suffered an injury-in-fact, including the loss of money and/or property, as a result of Defendant's unfair, deceptive, and/or unlawful practices, including the unauthorized interception of their Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, which have value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Plaintiffs and Class members have also suffered harm in the form of diminution of the value of their private and personally identifiable information and communications.

169. Defendant's actions caused damage to and loss of Plaintiffs' and Class members' property right to control the dissemination and use of their personal information and communications.

170. Defendant's representation that consumers could "DECLINE ALL" cookies and tracking technologies (including those used to "personalize and enhance [users'] experience on [Defendant's] site") if they clicked the "DECLINE ALL" button was untrue. Again, had Plaintiffs and Class members known these facts, they would not have used the Website. Moreover, Plaintiffs and Class members reviewed the popup cookie consent banner prior to their interactions with the Website. Had Defendant disclosed that it caused third-party cookies to be stored on Website visitors' devices that are related to personalization and/or share information with third parties even after they choose to decline "ALL" such cookies, Plaintiffs and Class members would have noticed it and would not have interacted with the Website.

171. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs and Class members to alter their positions to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiffs and Class members to, without limitation, use the Website under the mistaken belief that Defendant would not permit third parties to obtain users' Private Communications when consumers chose to decline "ALL" cookies. As a result, Plaintiffs and the Class provided more personal data than they would have otherwise.

172. Plaintiffs and Class members justifiably and reasonably relied on Defendant's misrepresentations and omissions, and, accordingly, were damaged by Defendant's conduct.

173. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs and Class members have suffered damages, as alleged above, and are entitled to just compensation, including monetary damages.

174. Plaintiffs and Class members seek punitive damages because Defendant's actions—which were malicious, oppressive, or willful—were calculated to injure Plaintiffs and Class members and made in conscious disregard of Plaintiffs' and Class members' rights and Plaintiffs' and Class members' declination of the Website's use of "ALL" cookies and tracking technologies. Punitive damages are warranted to deter Defendant from engaging in future misconduct.

**<u>Sixth Cause of Action</u>: Unjust Enrichment (on behalf of the Class)**

175. Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

176. Defendant created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

177. Defendant was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could "DECLINE ALL" cookies and tracking technologies, and by permitting the Third Parties to store and transmit cookies on Plaintiffs' and Class members' devices and browsers, which permitted the Third Parties to track and collect users' Private Communications, including their browsing history, visit history, website interactions, user input data, demographic information, interests and preferences, shopping behaviors, device information, referring URLs, session information, user identifiers, and/or geolocation data, even after Class members declined "ALL" such cookies.

178. Plaintiffs' and Class members' Private Communications have conferred an economic benefit on Defendant.

179. Defendant has been unjustly enriched at the expense of Plaintiffs and Class members, and Defendant has unjustly retained the benefits of its unlawful and wrongful conduct.

180. Defendant appreciated, recognized, and chose to accept the monetary benefits that Plaintiffs and Class members conferred onto Defendant at their detriment. These benefits were the expected result of Defendant acting in its pecuniary interest at the expense of Plaintiffs and Class members.

181. It would be unjust for Defendant to retain the value of Plaintiffs' and Class members' property and any profits earned thereon.

182. There is no justification for Defendant's enrichment. It would be inequitable, unconscionable, and unjust for Defendant to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct.

183. Plaintiffs and Class members are entitled to restitution of the benefits Defendant unjustly retained and/or any amounts necessary to return Plaintiffs and Class members to the

position they occupied prior to having their Private Communications tracked and collected by the Third Parties.

184. Plaintiffs plead this claim separately, as well as in the alternative, to their other claims, as without such claims Plaintiffs would have no adequate legal remedy.

## PRAYER FOR RELIEF

**WHEREFORE**, reserving all rights, Plaintiffs, on behalf of themselves and the Class and Subclass members, respectfully request judgment against Defendant as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as class counsel;

B. An award of compensatory damages, including statutory damages where available, to Plaintiffs and Class and Subclass members against Defendant for all damages sustained as a result of Defendant's wrongdoing, including both pre- and post-judgment interest thereon;

C. An award of punitive damages;

D. An award of nominal damages;

E. An order for full restitution;

F. An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

G. An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

H. For reasonable attorneys' fees and the costs of suit incurred; and

I. For such further relief as may be just and proper.

Dated: August 21, 2026

**GUTRIDE SAFIER LLP**

*/s/ Seth A. Safier*
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
100 Pine Street, Suite 1250

San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Plaintiffs*

# EXHIBIT A

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Claimant*

**AMERICAN ARBITRATION ASSOCIATION**

**SAN FRANCISCO REGIONAL OFFICE**

| | |
|---|---|
| VISHAL SHAH, an individual, on behalf of himself, the general public, and those similarly situated,<br><br>Claimant,<br><br>v.<br><br>MAZDA MOTOR OF AMERICA, INC. d/b/a MAZDA NORTH AMERICAN OPERATIONS (U.S.A.),<br><br>Respondent. | Arbitration Case No.<br><br>**COMPLAINT AND DEMAND FOR ARBITRATION** |

Claimant Vishal Shah ("Claimant") brings this action on behalf of himself, the general public and all others similarly situated against Mazda Motor of America, Inc. d/b/a Mazda North American Operations (U.S.A.) ("Respondent" or "Mazda").[1] Claimant's allegations are based upon information and belief and upon investigation of Claimant's counsel, except for allegations specifically pertaining to Claimant, which are based upon Claimant's personal knowledge.

[1] Claimant files this Complaint and Arbitration Demand without waiver of any right or argument, including without limitation, that Claimant did not assent to Respondent's arbitration agreement and/or that the purported arbitration agreement is unlawful and/or unenforceable.

## INTRODUCTION

1. This Complaint and Arbitration Demand concerns an egregious privacy violation and breach of consumer trust in blatant violation of California law. Respondent's website www.mazdausa.com (the "Website") is configured to use a multitude of cookies to enable third parties to track users' activity and communications on the Website even after users reject such cookies. At least until Claimant put Respondent on notice of the allegations contained herein, Respondent presented all visitors to the Website with a pop-up cookie window with the title "COOKIES ON THIS SITE" that provided Website users the opportunity to "AGREE" or "DECLINE ALL" of the "technologies," inclusive of cookies, used by Respondent's on the Website. By clicking the "DECLINE ALL" button, Claimant believed that he was declining and thereby rejecting "ALL" cookies in use on the Website, or at the very least, those "Functional and Targeting" cookies[2] associated with third-parties and their advertising. Claimant and hundreds of thousands of Website visitors did just that—they declined "ALL" cookies and proceeded to browse the Website. But, unbeknownst to them, and contrary to the express declination of ***"ALL" cookies***, Respondent nonetheless caused functional and/or targeting cookies, inclusive of advertising cookies—both from Respondent and third parties with notorious privacy records, including Google Inc. ("Google") and Adobe Inc. ("Adobe")—to be placed on the device of Claimant and those similarly situated. In doing so, Respondent caused the transmission of extensive data about Claimant, and those similarly situated, to undisclosed third parties, contrary to Respondent's representations and Claimant's and other consumers' express directions.

2. After Claimant notified Respondent in writing on or about September 30, 2023 that the "DECLINE ALL" button did not actually result in the declination of all cookies on the Website, let alone the many third-party functional and/or targeting cookies, inclusive of advertising cookies, that were nonetheless placed on Claimant's device following his clear declination of "ALL" cookies, Respondent changed its cookies popup window. Respondents'

---

[2] As described in Respondent's Privacy Policy then in effect.

Website cookie popup no longer[3] allows its Website users to "DECLINE ALL" cookies, and the cookie popup instead presents users with a much more limited and qualified subset of cookies from which Respondent now purports to allow its Website users to decline, as further alleged below.

3. Many of the third-party functional and/or targeting cookies that Respondent wrongfully placed on Claimant's and other consumers' devices and browsers are designed to track consumers' behavior across websites for marketing purposes. They are invasive because they allow third parties to track and collect, among other things: the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage keywords; buttons the consumers click; the exact date and time of the website visits; consumers' IP addresses; product page visits; and/or data entered by Claimant into forms on the Website.

4. Respondent allowed these third parties access to Claimant's and other consumers' communications with Respondent and enabled them to collect data on consumers for use for those parties' own purposes, including building profiles of consumers' interests and targeting advertising to them. This type of monitoring and data sharing is exactly what the consumers who declined "ALL" cookies sought to avoid. Despite receiving notice of consumers' declination of consent, through their express declination of "ALL" cookies, Respondent defied it. In doing so, Respondent violated privacy statutes, state consumer protection statutes, tort duties, and breached its contract and the implied covenant of good faith and fair dealing with Claimant and those similarly situated.[4]

## PARTIES

5. Claimant Vishal Shah is, and was at all relevant times, an individual and resident of California. Claimant intends to remain in California and makes his permanent home there.

---

[3] As of December 18, 2023.

[4] Claimant has not included class allegations in this Complaint and Demand but reserves the right to do so in an amended complaint once the Arbitrator has decided all threshold issues related to this Arbitration including without limitation jurisdiction, scope, and applicability.

6. Respondent Mazda Motor of America, Inc. d/b/a Mazda North American Operations (U.S.A.) is a California corporation with its principal place of business in Irvine, California.

**SUBSTANTIVE ALLEGATIONS**

7. Respondent Mazda Motor of America, Inc. d/b/a Mazda North American Operations (U.S.A.) is a vehicle manufacturer. It owns and operates the Website, which allows visitors to, among other things, search for and view information about Mazda vehicles.

8. Respondent chose to integrate the Website with cookies from third parties, which, among other things, track users' behavior on the Website.

9. Cookies are small text files that website servers can cause to be placed on an internet user's device when that user's browser interacts with the website through its servers. First-party cookies are cookies that are placed on a user's browser directly by the webserver with which the user is knowingly communicating (in this case, the Website). Third-party cookies are cookies that are set by other webservers (e.g. youtube.com, omtrcd.net, etc.). When a consumer visits the Website, both first-party cookies and third-party cookies are placed on the consumer's browser. All of this is caused by software code that Respondent incorporates into its Website, or that Respondent causes to be loaded. Because Respondent controls the software code of its Website, it has complete control over whether first-party and third-party cookies are set on users' devices when they visit the Website.

10. Third-party cookies, including those on the Website, are typically designed to track and record an Internet user's communications with and activities on websites. Third-party cookies typically work in furtherance of data collection, analytics, behavior profiling, and targeted advertising.

11. Cookies are the backbone of digital advertising. Because cookies enable third parties to track users' behavior across the Internet and correlate data collected to specific users, advertisers and purveyors of websites can gain deep understanding of users' behavioral traits and target those users with advertisements tailored to their interests.

12. As a research director at the Electronic Frontier Foundation put it, third-party cookies allow these companies "to be a silent third-party watching whatever you're doing."[5]

13. Every website is hosted by a web server through which it sends and receives communications with Internet users and their web browsers to display web pages on users' devices.

14. Users communicate with websites by sending HTTP requests, such as "GET" or "POST" requests. For example, when a user clicks on a hyperlink within a website, the user sends an HTTP request to the server hosting the website to which the user is sending the communication. The HTTP request tells the web server what information is being requested and instructs the web server to send that information to the user.

15. When a website has third-party cookies, those cookies are simultaneously placed on the user's device and made accessible to the user's browser. This allows third-party cookie companies to intercept contents of the Internet user's communications with websites, including data such as the URLs being browsed by the user; the webpage title; button clicks; and the date and time of the website visit.

**A. Respondent's Cookie Pop-Up Window Falsely Informed Consumers They May "DECLINE ALL" Cookies.**

16. When users visited the Website, a cookie pop up window was immediately displayed to the user.[6] As shown in the screenshot below, the pop-up window had the title "COOKIES ON THIS SITE" then stated that "We use technologies to personalize and enhance your experience on our site. Visit our Privacy Policy to learn more or manage your personal preferences in our Cookie Preferences Tool. If you agree to our use of these technologies, please select I AGREE below." The cookie popup window provided users the opportunity to

[5] Jefferson Graham, Facebook spies on us but not by recording our calls. Here's how the social network knows everything, USA Today (March 4, 2020 4:52 am), https://www.usatoday.com/story/tech/2020/03/04/facebook-not-recording-our-calls-but-has-other-ways-snoop/4795519002/.

[6] Since receiving notice from Claimant of the claims herein, Respondent has significantly changed the statements, appearance, and apparent substance of the choices available to consumers in its cookie popup window.

select buttons marked either "I AGREE" or "DECLINE ALL," or to click the "SEE POLICY DETAILS" hyperlink.




17. Consistent with Claimant's typical practice, Claimant clicked on the "DECLINE ALL" button, indicating Claimant's choice and/or agreement to decline all cookies. Respondent's cookie pop up window led Claimant, and those similarly situated, to believe that they declined or rejected **"ALL"** cookies, or at the very least the "Functional and Targeting" cookies, inclusive of advertising cookies, further described in Respondent's Privacy Policy**.** That belief, however, was false.

18. In truth, Respondent did not abide by its users' wishes. Even though Respondent received notice that certain users, through the selection of the "DECLINE ALL" button, did not consent to the disclosure of their personal information, nor the third-party cookies causing such disclosure, Respondent nonetheless placed third-party targeting or tracking cookies on those and other Website users' devices.

19. Unbeknownst to Claimant, and those similarly situated, Respondent caused numerous cookies (including third-party cookies) to be stored on Claimant's and other users'

devices, which caused the personal information of Claimant and those similarly situated to be transmitted and/or sold to third parties.

20. The following screenshots show examples of the third-party cookies and other data that the Website caused consumers' devices to transmit to third parties such as Google and Adobe—even *after* consumers selected the "DECLINE ALL" button:












21. Some of the third-party cookies in these exemplar screenshots are, according to the definitions put forth in Respondent's own Privacy Policy,[7] "Targeting Cookies also known

[7] According to the version of Respondent's Privacy Policy with an effective date of July 1, 2023, which is referred to throughout this Complaint and Demand as the "Privacy Policy."

as advertising Cookies" which "collect information about your online activities on mazdausa.com for the purpose of delivering relevant advertisements across our websites and/or online services."

22. Even though Respondent disclosed the existence and use of targeting/advertising cookies on the Website in its Privacy Policy, it did not adequately disclose that users, such as Claimant, would (and did) continue to receive those and other kinds of cookies even if they declined them. Besides the clear and unequivocal "DECLINE ALL" statement in Respondent's cookie popup window, Respondent further represented in its Privacy Policy to users of its Website that "[t]here are two categories of Cookies on our website, 'Functional and Targeting' and 'Necessary and Performance' Cookies." For the "Necessary and Performance" cookies, Respondent explains that these "are required" for the Website's operation and that users "cannot opt out of these Cookies." However, for "Targeting Cookies also known as advertising Cookies[,]" as well as "Functional" cookies, Respondent represents users can "register [their] preferences regarding 'Functional and Targeting' Cookies," by managing their cookie preferences.

23. *Even if* Claimant and other users knew, or should have known, that they could not really "DECLINE ALL" cookies (in that they would continue to receive "Necessary and Performance" cookies essential for the function of the Website), then there is *nothing* in Respondent's Privacy Policy that could reasonably be construed as notice to Claimant and other Website users that they would continue to receive "Functional and Targeting" cookies after expressly declining "ALL" cookies.

24. Unlike the "Necessary and Performance" cookies Respondent purportedly uses to ensure the proper operation of its Website, these functional and/or targeting (or advertising cookies) allow third parties to track and collect, among other things: the URLs being browsed by consumers as well as the referrer URL; webpage title; webpage keywords; the exact date and time of the website visits; the IP address of consumers' devices; consumers' geolocation; product page visits; and data consumers supply to the Website, such as data entered into forms on the Website. The identifier data sent to the third party with this information allows that third

party to correlate the data to the user or the user's device. As such, third parties can—and almost invariably do—use it to develop and enrich profiles on consumers like Claimant and target them with advertising.

25. The function and targeting (or advertising) cookies on the Website enable third parties, like Google and Adobe, to link individual users and devices with data regarding specific browsing activity on the Website.

26. The functional and/or targeting (or advertising) cookies that Respondent wrongfully placed on users' devices enabled third parties to track users' browsing history on the Website. Every time a user visits a new page on the Website after declining cookies, more data regarding users' browsing activity is sent to third parties, alongside the cookie data.

**B. Respondent Knew Its "DECLINE ALL" Statement Was Misleading and Admitted as Much When it Redesigning its Cookie Popup Window After Receiving Notice of Claimant's Claims.**

27. Claimant upheld his obligation under California law, including California's Consumer Legal Remedies Act, Cal. Civil Code §§ 1750, *et. seq.* (the "CLRA") and California's Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et. seq.* (the "CCPA"), in notifying Respondent of these and other alleged violations at issue in this Complaint and Demand, as well as requesting Respondent identify and compensate those affected. At an exact time unknown to Claimant, but which was, on information and belief, sometime following the date of Claimant's demand letter—September 30, 2023 (but before December 18, 2023)—Respondent significantly changed the statements, appearance, and apparent substance of choices available to consumers in its cookie popup window.

28. In particular, Respondent changed the cookie popup window to remove the unequivocal statement that Website users could "DECLINE ALL" cookies. Respondent's cookie popup window now states that Respondent uses "Cookies to operate our website…" and users may now only "Manage Preferences," as shown in this screenshot taken by Claimant's counsel on December 18, 2023:




29. Likewise, Respondent no longer offers users an apparent option to "DECLINE ALL" cookies. Respondent now informs users that they can apparently decline only "Advertising Cookies," and not the whole category of "Functional and Targeting Cookies,"[8] as shown in the following screenshots taken by Claimant's counsel on December 18, 2023:

[8] The current version of Respondent's privacy policy, dated November 17, 2023, does not appear to reflect these Website changes, nor does it include the new definitions put forward on the Website.







30. Even though Respondent has now modified its Website to correctly state that users cannot "DECLINE ALL" cookies, Claimant and thousands of other Website users similarly situated saw and relied upon Respondent's previous statements and

misrepresentations, as alleged above, and inclusive of those statements found in both the cookies popup window and the Privacy Policy.

31. Further, it appears that no other changes have been made to the operation of the Website itself, showing that the service and placement of third-party functional and targeting (advertising) cookies was and is an integral part of the Website's operation and an important part of Respondent's effort to profit from the operation of the Website, as described below.

**C. Third Parties Exploit Data Received from the Cookies on the Website**.

32. The more webpages a user views and interacts with on the Website, the more data third parties amass about the user. The third-party cookies that Respondent wrongfully allows to be stored on users' devices and browsers enable third parties to compile a vast repository of Claimant's browsing activity and to receive access to information that is otherwise unknowable. These third parties leverage the wrongfully collected information to their advantage, using it to compile browsing histories and habits into personal profiles on consumers, which are sold to advertisers to generate revenue and target advertising to users like Claimant. In particular, third-party cookies, such as those from the Website, allow third parties to draw inferences from information collected about users' browsing and search history on the Website to create profiles about consumers reflecting the consumer's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes.

33. For example, Google, whose cookies appear on the Website, provides Internet advertising in the manner described and alleged above. Google cookies, among other things, collect data about the user, such as user demographics and/or user behaviors, to create and update a profile of the user to fit the preferences of the user.

34. Just as the data that the third-party cookies collect is valuable to Google and other third-party cookie companies, it is valuable to Respondent as well. Data about users' browsing history enables Respondent to spot patterns in users' behavior on the Website and their interests in, among other things, specific Mazda vehicle features and models.

35. Targeting or advertising cookies, such as the cookies Respondent falsely claimed that Claimant and other Website users could decline or reject, are particularly useful for Respondent's advertising. For instance, if Respondent wanted to market certain Mazda vehicles to users, Respondent could use tracking cookies to monitor which consumers visit the webpages that relate to specific Mazda vehicles. Respondent can then advertise products and/or services related to the Mazda vehicles perused by those users across the internet.

36. Respondent's own Privacy Policy admits as much. It states, among other things:

> These Cookies are used for analytics purposes, to learn how visitors interact with the Online Services, to improve the Online Services, to facilitate your preferences (including opt-out requests), and to assess and facilitate the delivery of effective digital advertising on the Online Services and third-party platforms, including advertising that is personalized based on your inferred interests and preferences.
>
> …
>
> We share your internet-based activity information with third party advertisers for the purpose of marketing Mazda vehicles and services to you. These third parties may share your information with other third parties and they may use your information for their own marketing purposes or the marketing purposes of others, including internet-based advertising.

**D. The Intercepted Data Is Valuable.**

37. The information that the third-party cookie companies intercept, collect, and track about users through the third-party cookies Respondent causes to be placed on users' devices carries significant economic value. Legal scholars observe that "[p]ersonal information is an important currency in the new millennium." *See* Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 Harv. L. Rev. 2055, 2056–57 (2004). Indeed, "[t]he monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend." *Id.* "Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information." *Id.*

38. The value of the consumers' personal information provided to third parties through the cookies Respondent wrongfully placed can be quantified. For instance, in one study, researchers evaluated the value that 180 internet users placed on keeping personal data

secure. Participants valued web browsing history at $52.00 per year. Similarly, they valued web search history at $57.00 per year.




39. Similarly, the value of user-correlated web browsing history can be quantified because companies are willing to pay users for the exact type of data that the third parties here intercepted and collected—without permission—through the cookies on the Website. For example, Google Inc. operates a consumer research panel called "Google Screenwise Trends" which, according to Google, is designed "to learn more about how everyday people use the Internet."

40. As part of the program, Google has panelists add a browser extension that shares with Google the websites that users visit and how the panelists use them. The panelists **consent** to Google tracking this information for three months in exchange for one of a number of "gifts," including gift cards to retailers such as Barnes & Noble, Walmart, and Overstock.com.

41. After a panelist participates for three months, Google offers to pay additional gift cards "for staying with" the panel. These gift cards, valued at or around $5, demonstrate conclusively that internet industry participants understand the enormous value in internet users'

browsing habits. Google has subsequently offered to pay Screenwise participants up to $3 per week to be tracked.

42. Other platforms have recently developed that offer consumers the opportunity to directly monetize their own data. Killi, for instance, is a data exchange platform that allows consumers to own and earn income from their data.[9] Similarly, BIGtoken "is a platform to own and earn from your data. You can use the BIGtoken application to manage your digital data and identity and earn rewards when your data is purchased."[10]

43. The Nielsen Company is another example. Nielsen has extended its reach to computers and mobile devices through the Nielsen Computer and Mobile Panel. After a consumer installs Nielsen's application on his or her computer, phone, tablet, e-reader, or other mobile device, Nielsen tracks user's activity. In return, Nielsen enters users into sweepstakes with monetary benefits and compensates users with points worth up to $50 per month.[11]

44. Technology companies recognize the monetary value of users' sensitive, personal information insofar as they encourage users to install applications explicitly for the purpose of selling that information to technology companies in exchange for monetary benefits.[12]

45. The California Consumer Privacy Act ("CCPA") recognizes that consumers' personal data is a property right. Not only does the CCPA prohibit covered businesses from discriminating against consumers who opt-out of data collection, the CCPA also expressly

[9] https://killi.io/about-us/

[10] https://bigtoken.com/faq#general_0 ("Third-party applications and sites access BIGtoken to learn more about their consumers and earn revenue from data sales made through their platforms. Our BIG promise: all data acquisition is secure and transparent, with consumers made fully aware of how their data is used and who has access to it.").

[11] Kevin Mercandante, Ten Apps for Selling Your Data for Cash, Best Wallet Hacks (June 10, 2020), https://wallethacks.com/apps-for-selling-your-data/.

[12] Kari Paul, Google launches app that will pay users for their data, The Guardian (June 11, 2019), https://www.theguardian.com/technology/2019/jun/11/facebook-user-data-app-privacy-study; Saheli Roy Choudhury and Ryan Browne, Facebook pays teens to install an app that could collect all kinds of data, CNBC (Jan. 30, 2019), https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html; Jay Peters, Facebook will now pay you for your voice recordings, The Verge (Feb. 20, 2020), https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app.

provides that: "[a] business may offer financial incentives, including payments to consumers as compensation, for the collection of personal information, the sale of personal information, or the deletion of personal information." Cal. Civ. Code § 1798.125(b)(1). The CCPA provides that, "[a] business shall not use financial incentive practices that are unjust, unreasonable, coercive, or usurious in nature." Cal. Civ. Code § 1798.125(b)(4).

46. Through its false representations and unlawful data collection and dissemination, Respondent is unjustly enriching itself while depriving consumers of their ability to choose if and how they wish to monetize their personal data.

## CLAIMANT'S EXPERIENCES

47. During the last year, Claimant visited the Website to view content available on the Website.

48. When Claimant visited the Website, he was presented with a cookie popup window with a button reading "DECLINE ALL," indicating that users can decline all cookies "ON THIS SITE" by selecting the button.

49. Consistent with Claimant's typical practice, Claimant selected the "DECLINE ALL" button, indicating Claimant's choice and/or agreement to decline all cookies.

50. Even though Respondent's Privacy Policy discloses that the Website has two categories of cookies, of which "Necessary and Performance" cookies cannot be declined, the Privacy Policy states that users can "register" their preferences concerning "Functional and Targeting" cookies, of which "Targeting Cookies [are] also known as advertising Cookies[.]" Thus, when Claimant selected the "DECLINE ALL" button, he reasonably expected that all such advertising cookies would be declined or rejected along with at least the functional and targeting cookies. Respondent's cookie popup window led Claimant, and those similarly situated, to believe that they declined or rejected at least all functional and targeting cookies, inclusive of advertising cookies, if not "ALL" cookies.

51. Claimant believed that declining at least all functional and targeting cookies would keep his communications with the Website private.

52. By declining at least functional and targeting cookies, Claimant gave Respondent notice that he did not consent to the placement of such third-party cookies from the Website. In reliance on Respondent's representations and promises, only then did Claimant continue browsing the Website.

53. Despite the fact that Claimant declined at least functional and targeting (advertising) cookies, unbeknownst to him, Respondent nonetheless continued to cause the placement of such third-party functional and/or targeting cookies, including those from Google and Adobe, along with many others, on his device. In doing so, Respondent caused the transmission of private communications and data to third parties as Claimant browsed the Website.

54. Respondent's representation that consumers could decline at least functional and targeting cookies, if not "ALL" cookies, was untrue. Had Claimant known this fact, he would not have used the Website.

55. Moreover, Claimant reviewed the cookie popup window prior to using the Website. Had Respondent disclosed that it would continue to cause such third-party cookies to be stored on consumers' devices even when they choose to decline or reject all such cookies, Claimant would have noticed it and would not have used the Website or, at a minimum, would have interacted with the Website differently.

56. Claimant continues to desire to browse the Website and would like to browse other, similar websites that do not misrepresent that users can reject functional and targeting (advertising) cookies. If the Website was reconfigured to honor users' request to reject all such cookies, Claimant would likely browse the Website again in the future but will not do so until then.

57. Claimant regularly visits websites that feature content similar to that of the Website. Because Claimant does not know how the Website is configured, which can change over time, and cannot test whether the Website honors users' requests to reject functional and targeting (advertising) cookies, Claimant will be unable to rely on Respondent's

representations when browsing the Website in the future absent an injunction that prohibits Respondent from making misrepresentations on its Website.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### Invasion of Privacy Under California's Constitution

58. Claimant realleges and incorporates the paragraphs of this Complaint as if set forth herein.

59. California's constitution creates a right to privacy, and further creates a right of action against private entities such as Respondent.

60. The principal purpose of this constitutional right is to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Respondent.

61. Article I, Section 1 of the California Constitution provides:

> "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property and pursuing and obtaining safety, happiness, and privacy."

62. The phrase "and privacy" was added in 1972 after voters approved a proposed legislative constitutional amendment designated as Proposition 11. Proposition 11 was intended to curb businesses' control over the unauthorized collection and use of peoples' personal information, as the ballot argument stated:

> The right of privacy is the right to be left alone . . . . It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarrass us. Fundamental to our privacy is the ability to control circulation of personal information. This is essential to social relationships and personal freedom.[13]

63. This amended constitutional provision addresses the concern over accelerating encroachment on personal freedom and security caused by increasing surveillance and data

[13] Ballot Pamp., Proposed Stats. & Amends. To Cal. Const. With Arguments to Voters. Gen. Election *26 (Nov. 7, 1972).

collection activity in contemporary society. Its proponents meant to afford individuals more measure of protection against this most modern threat to personal privacy:

> Computerization of records makes it possible to create 'cradle-to-grave' profiles of every American. At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.[14]

In recognizing these privacy rights, the California Constitution provides insight into and serves to define the nature of the reasonable expectation of privacy of an objectively reasonable California resident.

64. To plead a California constitutional privacy claim, Claimant must show an invasion of (i) a legally protected privacy interest; (ii) where Claimant had a reasonable expectation of privacy in the circumstances; and (iii) conduct by Respondent constituting a serious invasion of privacy.

65. Respondent has intruded upon the following legally protected privacy interests of Claimant: (i) the California Invasion of Privacy Act, as alleged herein; (ii) the California Constitution, which guarantees Californians the right to privacy; (iii) the California Wiretap Acts as alleged herein; (iv) Cal. Penal Code § 484(a), which prohibits the knowing theft or defrauding of property "by any false or fraudulent representation or pretense;" and (v) Claimant's Fourth Amendment right to privacy. Claimant has a reasonable expectation of privacy in the conduct of his life, including his internet browsing activities and in the electronic communications and exchange of personal data with Respondent, since, among other things, Respondent affirmatively promised Claimant that he could decline, reject, or otherwise opt-out of "ALL" cookies, or at the very least "Functional and Targeting" cookies, inclusive of advertising cookies. Claimant directed his electronic devices to access the Website. When Claimant was presented with the cookie popup window on the Website, he reasonably expected that his action to "DECLINE ALL" cookies, or at least "Functional and Targeting" cookies, inclusive of advertising cookies, would be honored. That is, he reasonably believed

---

[14] *Id.*

that Respondent would not cause the placement of such cookies while he browsed the Website. Claimant also reasonably expected that, if he declined such cookies, Respondent would not share his communications and data with third parties or collect such data itself. Claimant further reasonably expected that the Website would not cause his browser to store and send cookies and other data to third parties, which then used that data to track Claimant's activity, such as the URLs being browsed by Claimant as well as the referrer URL; webpage title; webpage keywords; the exact date and time of the Website visits; the IP address of Claimant's computer; product page visits; and/or data that Claimant supplied to the Website. Such information is "personal information" under California law, which defines personal information as including "Internet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

66. Respondent, in violation of Claimant's reasonable expectation of privacy, allowed third-party cookie companies to collect, track and compile the web browsing activity and communications of Claimant and those similarly situated. The data that Respondent allowed third parties to collect enabled third parties to assemble comprehensive profiles of Claimant's life. Those profiles are, and can be, used to further invade Claimant's privacy, by, *inter alia*, allowing third parties to learn intimate details of Claimant's life, and target him for advertising and other purposes as described herein, thereby harming Claimant through the abrogation of Claimant's autonomy and ability to control dissemination and use of his personal information.

67. Respondent's actions constituted a serious invasion of privacy in that those actions invaded a zone of privacy protected by the Fourth Amendment—i.e., one's personal communications—and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

68. Respondent's intrusion into Claimant's privacy was also highly offensive to a reasonable person in that Respondent violated criminal and civil laws designed to protect individual privacy and against theft.

69. The surreptitious and unauthorized disclosure of the internet activity and communications of thousands, if not millions, of consumers constitutes an egregious breach of social norms.

70. Respondent lacked a legitimate business interest in causing the placement of third-party cookies that allowed third-party companies, including marketing, advertising, and social media companies, to track, intercept, receive, and collect data about users and their browsing history without their consent.

71. Claimant has been damaged by Respondent's invasion of his privacy and is entitled to just compensation, including disgorgement of profits related to the unlawful tracking, and injunctive relief.

**<u>SECOND CAUSE OF ACTION</u>**

**Violation of the California Invasion of Privacy Act**

**California Penal Code § 631**

72. Claimant realleges and incorporates by reference all paragraphs alleged herein.

73. California Penal Code § 631(a) provides, in pertinent part:

> "Any person who, by means of any machine, instrument, or contrivance, or in any other manner . . . willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section, is punishable by a fine not exceeding two thousand five hundred dollars . . . ."

74. To establish liability under § 631(a), a Claimant need only establish that Respondent, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> Or

> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> Or
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> Or
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

Cal. Penal Code § 631(a).

75. Respondent is a "person" within the meaning of California Penal Code § 631.

76. Under § 631(a), Respondent must show it had the consent of all parties to a communication.

77. Respondent did not have the consent of all parties to learn the contents of or record Claimant's private communications. Respondent also did not have consent to allow third parties to learn the contents of or record Claimant's private communications.

78. Respondent utilizes software code on the Website that allows third parties to intercept Claimant's private communications and web activity on the Website.

79. The Website causes the user's browser to store cookies from third parties, and to transmit those cookies alongside other data—such as button clicks, and specific URL visits—to the third party. By configuring the Website in this manner, Respondent intentionally accessed, intercepted, read, learned, and/or collected the electronic communications of Claimant, and aided and abetted the third-party cookie companies, including, but not limited to, Google and Adobe, to access, intercept, read, learn, and/or collect the electronic communications of Claimant as well.

80. Section 631(a) is not limited to phone lines, but also applies to "new technologies," such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic

communications”); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook’s collection of consumers’ Internet browsing history).

81. The following items constitute “machine[s], instrument[s], or contrivance[s]” under the CIPA (and even if they do not, Respondent’s deliberate and purposeful scheme that facilitated the interceptions falls under the broad statutory catch-all category of “any other manner”): (i) the Website, including the software code modules therein that are designed to cause the transmission of consumers’ communications and web activity to third-parties; (ii) the third-party cookies on the Website; (iii) Respondent’s computer servers, including the software code modules installed on and/or served by those servers, used to place cookies and/or intercept, aid and abet others to intercept, receive, transmit, read, track, and analyze Claimant’s communications; and (iv) the plan Respondent carried out to place cookies and/or intercept, aid and abet others to intercept, collect, transmit, read, and track Claimant’s communications, even though Claimant explicitly declined such actions (collectively, the “Mazda Instruments”).

82. The private communications that were intercepted, collected, transmitted, received, tracked, and analyzed by the Mazda Instruments alleged above included the following:

- internet IP address of consumers’ devices;
- the URLs browsed by users of the Website, as well as the referrer URL;
- the title of webpage viewed;
- webpage keywords;
- the exact date and time of the website visits; and
- device identifiers.

(Collectively, the information listed in the bullet points above shall be referred to as “Private Communications.”)

83. By enabling the Mazda Instruments to intercept, collect, transmit, receive, track, and analyze Claimant’s Private Communications without Claimant’s consent, and by aiding

and abetting third parties to intercept, collect, transmit, receive, track, and analyze such Private Communications, Respondent violated Section 631(a) of the CIPA. In particular, Respondent:

- intentionally tapped, electrically or otherwise, the lines and/or instruments of internet communication being used by Claimant to access the Website;
- intentionally made unauthorized connections, electrically or otherwise, with the lines and/or instruments of internet communication being used by Claimant to access the Website and allowed third parties to do so;
- willfully, and without the consent of Claimant, read and learned the contents and/or meaning of Claimant's messages and communications containing Private Communications, while the same was in transit or passing over lines of internet communication, or was being sent from and received at locations in California and allowed third parties to do so;
- used Claimant's Private Communications to increase Respondent's profits;
- allowed third parties to intercept, collect, transmit, receive, track, and analyze Claimant's Private Communications; and
- aided, agreed with, and conspired with other persons (including, without limitation, Google and Adobe, and other third-party cookie companies) to unlawfully do, permit, and cause to be done the above-listed activities.

84. Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

85. Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because Claimant frequently uses the internet to search for information about Mazda and other manufacturers' motor vehicles. Claimant continues to desire to use the internet for that purpose. Claimant has no practical way to know if his request to decline cookies will be honored and/or whether his actions on the Website will be monitored or recorded by Respondent. Further, Respondent and third parties have already intercepted

Claimant's Private Communications, and are currently sharing, and will continue sharing, that information with additional third parties, unless and until enjoined.

86. Claimant seeks all relief available under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

**<u>THIRD CAUSE OF ACTION</u>**

**Violation of the California Invasion of Privacy Act**

**California Penal Code § 635**

87. Claimant realleges and incorporates by reference all paragraphs alleged herein.

88. The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

89. California Penal Code § 635 provides as follows:

> Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another, or any device which is primarily or exclusively designed or intended for the unauthorized interception or reception of communications between cellular radio telephones or between a cellular radio telephone and a landline telephone in violation of Section 632.5, or communications between cordless telephones or between a cordless telephone and a landline telephone in violation of Section 632.6 , shall be punished by a fine not exceeding two thousand five hundred dollars.

90. Respondent intentionally manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported, imported, and/or furnished one or more wiretap devices (i.e., the Mazda Instruments, including the software code modules therein) primarily or exclusively designed or intended for eavesdropping upon the communication of another (i.e., Claimant).

91. In particular, the Mazda Instruments contain software code modules that are primarily or exclusively designed to enable third parties to intercept, collect, transmit, receive,

and track communications that users reasonably (but erroneously) believed would be sent directly and exclusively to Respondent. Further, even though Claimant intended to decline "ALL" cookies, or at the very least, "Functional and Targeting" cookies, inclusive of advertising cookies, the software code modules of the Mazda Instruments were designed to—and in fact did—cause the placement of such cookies and software code which were used to intercept, collect, transmit, receive, track, analyze, and sell users' Private Communications to third parties.

92. Claimant did not consent to any of Respondent's actions in implementing the wiretaps.

93. Claimant has suffered loss by reason of these violations, including, but not limited to, (i) violation of his right to privacy; and (ii) loss of value in his Private Communications.

94. Unless enjoined, Respondent will continue to commit the illegal acts alleged here. Claimant continues to be at risk because he frequently uses the internet to search for information about for, among other things, Mazda and other manufacturers' motor vehicles. Claimant continues to desire to use the internet for that purpose, including for the purpose of viewing Mazda-related content. Claimant has no practical way to know if his request to decline cookies will be honored and/or whether his actions on the Website will be monitored or recorded by Respondent. Further, Respondent has already collected his Private Communications, and is currently sharing, and will continue sharing, that information with third parties, unless and until enjoined.

95. Claimant seeks all relief available under the California Invasion of Privacy Act, including injunctive relief and statutory damages.

## FOURTH CAUSE OF ACTION

### Violation of the California Comprehensive Computer Data Access and Fraud Act

### California Penal Code § 502

96. Claimant realleges and incorporates by reference all paragraphs alleged herein.

97. Cal. Penal Code § 502 provides: "For purposes of bringing a civil or a criminal action under this section, a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Devices with web browsers are "computers" within the meaning of the statute.

98. Respondent violated Cal. Penal Code § 502(c) by, among other things, (i) knowingly causing Claimant's and other users' computers to be accessed through third-party cookies and third-party software code that causes the transmission of users' data to be transmitted to third-party cookie companies; (ii) knowingly accessing and without permission using Claimant's and other users' data and computers to devise or execute any scheme or artifice to defraud and/or deceive, and wrongfully obtain data; and (iii) knowingly accessing and without permission making use of data from Claimant and other users' computers as well as allowing third-parties to do so.

99. Despite Respondent's false representations to the contrary, Respondent was unjustly enriched by acquiring Claimant's sensitive and valuable personal information without permission and using it for Respondent's own financial benefit. Claimant retains a stake in the profits Respondent earned from Claimant's personal browsing history and other data because, under the circumstances, it is unjust for Respondent to retain those profits.

100. Respondent allowed third parties and itself to access, copy, take, analyze, and use data from Claimant's devices while he was in the State of California. Accordingly, Respondent is deemed to have accessed Claimant's devices in California.

101. As a direct and proximate result of Respondent's unlawful conduct within the meaning of Cal. Penal Code § 502, Respondent has caused loss to Claimant and has been unjustly enriched.

102. Claimant seeks compensatory damages and/or disgorgement, and declarative, injunctive, or other equitable relief.

103. Claimant is entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Respondent's violations were willful and, upon information and

belief, Respondent is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

104. Claimant is also entitled to recover reasonable attorneys' fees pursuant to Cal. Penal Code § 502(e).

**FIFTH CAUSE OF ACTION**

**Violation of the California False Advertising Law,**

**Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL")**

105. Claimant realleges and incorporates by reference all paragraphs alleged herein.

106. Beginning at an exact date unknown to Claimant, but within four (4) years preceding the filing of this Complaint, Respondent, with the intent to directly or indirectly perform services, or to induce members of the public to enter into obligations relating thereto, made or disseminated or caused to be made or disseminated before the public and Claimant statements concerning such services, or matters of fact connected with the performance thereof, which were untrue or misleading, and which Respondent knew, or in the exercise of reasonable care should have known, were untrue or misleading, in violation of the FAL. In particular, Respondent made untrue, false, deceptive, and/or misleading statements in connection with its cookie popup window and Privacy Policy.

107. Respondent's cookie popup window asserts facts about its services that are untrue and likely to deceive and mislead the public and reasonable consumers. In particular, Respondent made representations and statements (by omission and commission) that consumers could "DECLINE ALL" "COOKIES ON THIS SITE" (Respondent's Website), or at least the "Functional and Targeting" cookies, inclusive of advertising cookies, further defined and described in Respondent's own Privacy Policy. These representations led reasonable customers to believe that they could reject such cookies and, in doing so, Respondent would not cause the placement of third-party cookies on consumers' devices and browsers for those purposes, nor could third parties collect, receive, intercept, and compile data about users' browsing activity and Private Communications from the Website. Respondent had a duty to disclose that, despite consumers election to reject such cookies, the Website would

nonetheless cause the user's browser to store such cookies and send data to third parties, who can then use that data to track the user's activity and target them with advertising.

108. Claimant, and those similarly situated, relied to their detriment on Respondent's false, misleading, and deceptive advertising and marketing practices, including each of the misrepresentations and omissions set forth above. Relying on Respondent's misrepresentations about its services—specifically its false and misleading representation that users could decline, reject, or otherwise opt-out of "ALL" cookies, or at least functional and targeting cookies, inclusive of advertising cookies—Claimant used the Website.

109. Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of Claimant's personal information and communications.

110. Respondent's representation that consumers could decline, reject, or otherwise opt-out of "ALL" cookies, or at least functional and targeting cookies, inclusive of advertising cookies, if they elected to do so was untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the cookie popup window prior to using the Website. Had Respondent disclosed that it caused such cookies to be stored on consumers' devices even when they choose to reject such cookies, Claimant would have noticed it and would not have used the Website.

111. Respondent's acts and omissions are likely to deceive the general public.

112. Respondent engaged in these false, misleading, and deceptive advertising and marketing practices to increase its profits. Respondent generated revenue by using the wrongfully collected information to, among other things, engage in targeted advertising.

113. Accordingly, Respondent has engaged in false advertising, as defined and prohibited by Section 17500, *et seq.* of the California Business and Professions Code.

114. The aforementioned practices, which Respondent used, and continues to use, to its significant financial gain also constitute unlawful competition and provide an unlawful advantage over Respondent's competitors as well as injury to the general public.

115. Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the

unauthorized disclosure and taking of his personal information which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his Private Communications and data.

116. Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of his personal information and communications.

117. Claimant seeks, on behalf of himself and those similarly situated, a declaration that the above-described practices constitute false, misleading, and deceptive advertising.

118. Claimant seeks full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Respondent to Claimant, and those similarly situated, by means of the false, misleading, and deceptive advertising and marketing practices complained of herein, plus interest thereon.

119. Claimant seeks, on behalf of himself and those similarly situated, an injunction to prohibit Respondent from continuing to engage in the false, misleading, and deceptive advertising and marketing practices complained of herein. Such misconduct by Respondent, unless and until enjoined and restrained, will continue to cause injury in fact to the general public and the loss of money and property in that Respondent will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Respondent to which they are not entitled. Claimant, those similarly situated, and/or other consumers have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

## SIXTH CAUSE OF ACTION

**Violation of the California Unfair Competition Law,**

**Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL")**

120. Claimant realleges and incorporates by reference all paragraphs alleged herein.

121. The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. By engaging in the aforementioned practices, Respondent has violated the UCL.

122. Respondent is a "person" under Cal. Bus. & Prof. Code § 17201.

123. Respondent created and implemented a scheme to obtain and share the Private Communications and private web activity from web users through a pervasive pattern of false and misleading misrepresentations and omissions. Respondent misrepresented to Claimant and other web users that they could decline, reject, or otherwise opt-out of "ALL" cookies, or at least functional and targeting cookies, inclusive of advertising cookies when, in fact, Respondent caused such cookies to be placed on consumers' devices and browsers, even after users rejected those cookies. Respondent concealed and failed to disclose to Claimant and other web users that it would cause such cookies and software code to be stored on consumers' devices and browsers which would cause the interception and transmission of data about users' activity on the Website and Private Communications to third parties and Respondent, despite consumers' clear refusal of such cookies. Further, Respondent failed to disclose to Claimant and web users that these third-party cookies enable third parties to track consumers' behavior across the Website and use that data to compile profiles of consumers for targeted advertising and marketing purposes. In particular, the third-party cookies that Respondent wrongfully placed on consumers' devices and browsers enabled third parties and Respondent to track and collect consumers' Private Communications and browsing history on the Website. With this information, third parties can—and almost invariably do—develop and enrich profiles on consumers, like Claimant, to, among other things, target advertising to them.

124. These representations and omissions were misleading and deceptive.

125. Respondent's conduct was unfair and unconscionable, particularly because Respondent allowed third parties to intrude on communications that users reasonably believed to be private, and because Respondent made users' Private Communications available to third parties, despite representing that Website users could decline, reject, or otherwise opt-out of "ALL" cookies, or at least functional and targeting cookies, inclusive of advertising cookies.

126. Respondent's conduct was fraudulent and deceptive because the misrepresentations and omissions at issue were likely to, and in fact did, deceive reasonable consumers. Reasonable consumers, including Claimant, would have found it material to their decisions to use the Website that Respondent would intercept, collect, transmit, receive, track, and analyze consumers' Private Communications against their wishes and without their consent, and make those Private Communications available to third parties via cookies despite their clear refusal of such cookies. Knowledge of these facts would have been a substantial factor in the consumers' decisions to use the Website.

127. Respondent's acts and practices constitute a continuing and ongoing unfair business activity defined by the UCL. Respondent's conduct is contrary to the public welfare as it transgresses civil and criminal statutes of the State of California designed to protect individuals' constitutional and statutory rights to privacy, violates established public policy, and has been pursued to attain an unjustified monetary advantage for Respondent by creating personal disadvantage and hardship to users of the Website. As such, Respondent's business practices and acts have been immoral, unethical, oppressive, and unscrupulous and have caused injury to customers far greater than any alleged countervailing benefit. The harm to consumers, which includes the interception of their communications by third parties, the wrongful collection and tracking of consumers' Private Communications, and the construction of profiles about consumers that third parties and Respondent use for their monetary gain, far outweigh the value of Respondent's conduct (i.e., the wrongful placement of unwanted third-party cookies on consumers' devices and browsers even when consumers reject such cookies).

128. Further, Respondent's "unfair" acts and practices include its violation of property, economic and privacy interests protected by the statutes identified above. To establish liability under the unfair prong, Claimant need not establish that these statutes were actually violated, although the claims pleaded herein do so.

129. Respondent owed Claimant a duty to disclose these facts because they were exclusively known and/or accessible to Respondent, who had superior knowledge of its activities with respect to the Private Communications of Claimant and users; because

Respondent actively concealed the facts; and because Respondent intended for consumers to rely on the omissions in question. Moreover, Respondent's omissions were contrary to representations that Respondent actually made to consumers that they could decline, reject, or otherwise opt-out of "ALL" cookies, or at least functional and targeting cookies, inclusive of advertising cookies.

130. Claimant, and those similarly situated, relied on Respondent's misrepresentations and omissions. Reasonable consumers would have relied on Respondent's promise to consumers that they could decline, reject, or otherwise opt-out of "ALL" cookies, or at least functional and targeting cookies, inclusive of advertising cookies, and, in light of that promise, would have relied on the misrepresentations and omissions, particularly because Respondent made representations to the contrary and consumers were not informed that Respondent would cause such third-party cookies to be stored on consumers' devices and browsers, despite consumers' clear rejection of such third-party cookies.

131. Respondent's conduct was also unlawful in that it violated the following statutes: the California Invasion of Privacy Act, Cal. Penal Code §§ 502, 630–638; the FAL; and the CLRA. Respondent's conduct also breached the promises Respondent made in its cookie popup window and the Privacy Policy.

132. Moreover, Respondent's conduct was unlawful and violated California's Consumer Privacy Act, Cal. Civ. Code § 1798.100, *et seq.*, which sets strict standards regarding the collection, use, retention, sharing, and sale of "personal information," including but not limited to, §§ 1798.100(a), (b), (c), (e), 1798.110, 1798.115, 1798.120, 1798.130.

133. For instance, Respondent violated Cal. Civ. Code § 1798.100(a) and § 1798.115 by (a) informing consumers that they could decline, reject, or otherwise opt-out of "ALL" cookies, or at least functional and targeting cookies, inclusive of advertising cookies, but, nonetheless, causing such cookies to be placed on users' devices and browsers and causing the transmission of consumers' Private Communications to third parties after users declined or rejected such cookies; (b) failing to inform consumers that third parties would collect their Private Communications after declining or rejecting such cookies; and (c) failing to inform

consumers that third-party cookie companies would use data collected to compile profiles on consumers after declining or rejecting such cookies. Respondent further violated Cal. Civ. Code § 1798.100(e) because Respondent collects consumers' personal information and do not implement reasonable security procedures and practices appropriate to the nature of the personal information to protect the personal information from unauthorized or illegal access, destruction, use, modification, or disclosure in accordance with Cal. Civ. Code § 1798.81.5. Such security procedures Respondent could have implemented could have been to simply honor consumers' requests to decline, reject, or otherwise opt out of such cookies.

134. Respondent also violated Cal. Civ. Code § 1798.120 because it received direction from Claimant and other users not to sell their personal information when they chose to decline, reject, or otherwise opt out of such cookies, but Respondent nonetheless caused such third-party cookies to be placed on Claimant and other users' devices and browsers, and thereby sold their Private Communications to third-parties.

135. Claimant has suffered an injury-in-fact, including the loss of money and/or property as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information, which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

136. Respondent's actions caused damage to and loss of Claimant's property right to control the dissemination and use of his personal information and Private Communications.

137. Respondent's representation that consumers could decline, reject, or otherwise opt-out of "ALL" cookies, or at least functional and targeting cookies, inclusive of advertising cookies, if they elected to do so, was untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the cookie popup window prior to using the Website. Had Respondent disclosed that it causes such functional and targeting cookies, inclusive of advertising cookies, to be stored on consumers' devices, even after they

choose to decline, reject, or otherwise opt-out of such cookies, Claimant would have noticed it and would not have used the Website.

138. The wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Respondent's business. Respondent's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, in the State of California.

139. Claimant, on behalf of himself and the general public, seeks restitution, injunctive relief, and reasonable attorneys' fees, as well as any other relief deemed proper.

## SEVENTH CAUSE OF ACTION

### Violation of the Consumers Legal Remedies Act

### California Civil Code §§ 1750, *et seq.* ("CLRA")

140. Claimant realleges and incorporates by reference all paragraphs alleged herein.

141. Respondent's actions, representations and conduct described herein have violated, and continue to violate, the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

142. Claimant, and other Website users, are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

143. The Website and Respondent's online platform services are "services" under the CLRA.

144. Respondent's representations, set forth in this Complaint, led Website users to falsely believe that they could decline, reject, or otherwise opt-out of "ALL" cookies, or at least functional and targeting cookies, inclusive of advertising cookies. Website users further believed, that in doing so, Respondent would not cause such cookies and third-party software code to be placed on consumers' devices to cause the transmission of consumers' web activity and Private Communications to third parties (which allow Respondent and third parties to track consumers' behavior on the Website). By engaging in the actions, representations, and conduct set forth in this Complaint, Respondent has violated, and continues to violate, § 1770(a)(5), § 1770(a)(7), and § 1770(a)(9) of the CLRA.

145. In violation of California Civil Code § 1770(a)(5), Respondent's acts and practices constitute improper representations that its Website service has sponsorship, approval, characteristics, uses, or benefits, which it does not have. In violation of California Civil Code § 1770(a)(7), Respondent's acts and practices constitute improper representations that its Website service is of a particular standard, quality, or grade, when it is of another. In violation of California Civil Code § 1770(a)(9), Respondent has advertised services with intent not to sell them as advertised.

146. Claimant requests that Respondent be enjoined from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2). If Respondent is not restrained from engaging in these types of practices in the future, Claimant and users will continue to suffer harm. Claimant, and those similarly situated, have no adequate remedy at law to stop Respondent's continuing practices.

147. On or about September 30, 2023, Claimant provided Respondent with notice and a demand to correct, or otherwise rectify the unlawful, unfair, false, and/or deceptive practices complained of herein. Despite receiving the notice and demand, Respondent failed to do so. Among other things, Respondent failed to identify consumers, notify them of their right to remedies under the CLRA, and/or to provide that remedy. Accordingly, Claimant seeks, pursuant to California Civil Code § 1780(a)(3), compensatory damages, punitive damages, and restitution of any ill-gotten gains due to Respondent's acts and practices.

148. Claimant also requests that he be awarded costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

## EIGHTH CAUSE OF ACTION

### Intrusion Upon Seclusion

149. Claimant realleges and incorporates by reference all paragraphs alleged herein.

150. To assert a claim for intrusion upon seclusion, Claimant must plead (i) that Respondent intentionally intruded into a place, conversation, or matter as to which Claimant had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

151. By causing unwanted cookies to be stored on consumers' devices, which enabled third parties to intercept, collect, transmit, receive, track, and analyze consumers' internet activity and Private Information in violation of Respondent's representations that consumers could decline, reject, or otherwise opt-out of "ALL" cookies, or at least functional and targeting cookies, inclusive of advertising cookies, Respondent intentionally intruded upon the solitude and/or seclusion of users in that Respondent effectively placed third parties, including, but not limited to, Google and Adobe, in the middle of communications to which they were not invited, welcomed, or authorized.

152. The tracking and access caused by the cookies that Respondent caused to be stored on consumers' devices was not authorized by Claimant, and, in fact, Claimant specifically chose to reject such cookies.

153. Claimant had an objectively reasonable expectation of privacy surrounding his communications and web browsing activity on the Website based on Respondent's promise that users could decline, reject, or otherwise opt-out of "ALL" cookies, or at least functional and targeting cookies, inclusive of advertising cookies, as well as state criminal and civil laws designed to protect individual privacy.

154. Respondent's intentional intrusion into Claimant's internet communications and web browsing history would be highly offensive to a reasonable person given that Respondent represented that consumers could decline, reject, or otherwise opt-out of "ALL" cookies, or at least functional and targeting cookies, inclusive of advertising cookies, when, in fact, it caused those cookies to be stored on consumers' devices and browsers even after consumers rejected all such cookies. Indeed, Claimant reasonably expected, based on Respondent's false representations, that Respondent would not cause such cookies to be stored on Claimant's devices or cause the transmission of Claimant's internet activities to third parties.

155. Respondent's conduct was intentional and intruded on Claimant's communications which constitute private searches, web browsing activity, and other data.

156. Claimant has been damaged as a direct and proximate result of Respondent's invasion of his privacy and is entitled to just compensation. Respondent's invasion of privacy caused Claimant to suffer damages, including but not limited to:

a. Nominal damages;

b. General damages for invasion of his privacy rights in an amount to be determined by a jury without reference to specific pecuniary harm;

c. Sensitive and confidential information that Claimant intended to remain private is no longer private; and

d. Respondent and the third-party cookie companies took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value.

157. Claimant seeks appropriate relief for that injury, including but not limited to, damages that will reasonably compensate him for the harm to his privacy interests as well as disgorgement of profits made by Respondent as a result of its intrusions upon Claimant's privacy.

## NINTH CAUSE OF ACTION

### Breach of Contract

158. Claimant realleges and incorporates by reference all paragraphs alleged herein.

159. Respondent's relationship with its users is governed by the Website's cookie popup window and Privacy Policy, among other documents.

160. These governing documents, including the Website's cookie popup window and Privacy Policy, contain enforceable promises that Respondent made to Claimant, including but not limited to the following:

a. That Website users could "DECLINE ALL" "COOKIES ON THIS SITE" (Respondent's Website), as stated in the cookie popup window, and,

b. That "[t]here are two categories of Cookies on our website, 'Functional and Targeting' and 'Necessary and Performance' Cookies." For the "Targeting

Cookies also known as advertising Cookies[,]" as well as "Functional" cookies, that Website users could "register [their] preferences regarding 'Functional and Targeting' Cookies," by managing preferences, as stated in the Privacy Policy.

161. Respondent breached these duties and violated these promises by causing such cookies and software code to be stored on consumers' devices and browsers that cause the transmission of Claimant's and private web activity and Private Communications to third parties and Respondent even though Respondent represented that Claimant could decline, reject, or otherwise opt out of such cookies.

162. Respondent further violated these provisions because Respondent did not honor users' requests to decline or otherwise opt-out of the selling and sharing of online data through the use of cookies and similar technologies, as described above, and because Respondent shared users' information with third parties even when users did not consent to such sharing.

163. At all relevant times and in all relevant ways, Claimant performed his obligations under the contract(s) in question or was excused from performance of such obligations through the unknown and unforeseen conduct of others.

164. As a direct and proximate result of Respondent's breach of contract, Claimant did not receive the full benefit of the bargain, and instead received services from Respondent that were less valuable than described in the contract. Claimant, therefore, was damaged in an amount at least equal to the difference in value between that which was promised and Respondent's partial, deficient, and/or defective performance.

165. Respondent's breach caused Claimant the following damages:

a. Nominal damages;

b. The diminution in value of Claimant's personal information;

c. The loss of privacy due to Respondent making sensitive and confidential information that Claimant intended to remain private no longer private;

d. Respondent took something of value from Claimant and derived benefits therefrom without Claimant's knowledge or informed consent and without sharing the benefit of such value; and

e. Claimant suffered an invasion of privacy. Claimant seeks compensatory damages for the invasion of his privacy.

166. As a direct consequence of the breaches of contract and violations of promises described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, unjust enrichment, and any other just relief.

**TENTH CAUSE OF ACTION**

**Breach of Implied Covenant of Good Faith and Fair Dealing**

167. Claimant realleges and incorporates by reference all paragraphs alleged herein.

168. Respondent's relationship with its users is governed by the Website's cookie popup window and the Privacy Policy, among other documents.

169. These governing documents, including the Website's cookie popup window and the Privacy Policy, contain enforceable promises that Respondent made to Claimant and users, including but not limited to the following:

a. That Website users could "DECLINE ALL" "COOKIES ON THIS SITE" (Respondent's Website), as stated in the cookie popup window, and,

b. That "[t]here are two categories of Cookies on our website, 'Functional and Targeting' and 'Necessary and Performance' Cookies." For the "Targeting Cookies also known as advertising Cookies[,]" as well as "Functional" cookies, that Website users could "register [their] preferences regarding 'Functional and Targeting' Cookies," by managing preferences, as stated in the Privacy Policy.

170. Respondent breached these duties and violated these promises by causing such cookies and software code to be stored on Claimant's devices and browsers that cause the transmission of Claimant's private web activity and Private Communications to third parties and Respondent, even though Respondent promised that Claimant could decline, reject, or otherwise opt out of such cookies, and Claimant, in fact, chose to opt out of such cookies.

171. California law recognizes the implied covenant of good faith and fair dealing in every contract.

172. In dealing between Respondent and its users, Respondent is invested with discretionary power affecting the rights of its users.

173. Respondent purports to respect and protect its users' privacy.

174. Despite its contractual promises to allow consumers to decline, reject, or otherwise opt-out of receiving "ALL" cookies, or at least functional and targeting cookies, inclusive of advertising cookies, Respondent took actions outside that contractual promise to deprive Claimant of benefits of his contract with Respondent.

175. Respondent's own tracking and its allowance of third parties to track and intercept internet communications was objectively unreasonable given its privacy promises.

176. Respondent's unauthorized disclosure of users' personal information to Respondent was objectively unreasonable given Respondent's privacy promises.

177. Respondent's conduct in tracking and causing third parties to intercept and track the internet communications of users who declined, rejected, or otherwise opted-out of receiving such cookies evaded the spirit of the bargain made between Respondent and Claimant, since it caused Claimant to surrender more data than Respondent otherwise bargained for.

178. As a result of Respondent's misconduct and breach of its duty of good faith and fair dealing, Claimant suffered damages. Claimant did not receive the benefit of the bargain for which he contracted and for which he paid valuable consideration in the form of his personal information, which, as alleged above, has ascertainable value.

179. As a direct consequence of the breach of the implied covenant of good faith and fair dealing described above, Claimant seeks nominal damages, general damages, compensatory damages, consequential damages, and any other just relief.

**<u>ELEVENTH CAUSE OF ACTION</u>**

**Common Law Fraud, Deceit, and/or Misrepresentation**

180. Claimant realleges and incorporates by reference all paragraphs alleged herein.

181. Respondent has fraudulently and deceptively informed Claimant that he could "DECLINE ALL" "COOKIES ON THIS SITE" (Respondent's Website), or at least the

"Functional and Targeting" cookies, inclusive of advertising cookies, further defined and described in Respondent's own Privacy Policy. In fact, Respondent caused such cookies and software code to be stored on consumers' devices—including Claimant's—even after users rejected such cookies. These cookies and software code caused the transmission of private web activity and Private Communications to third parties and Respondent when consumers visited and/or used the Website, even after consumers declined, rejected, or otherwise opted out of receiving such cookies.

182. These misrepresentations and omissions were known exclusively to, and actively concealed by, Respondent, not reasonably known to Claimant, and material at the time they were made. Respondent knew, or should have known, how the Website and cookies on the Website functioned, through testing the Website or otherwise, and knew, or should have known, that the Website placed such cookies on users' devices—including Claimant's—even after users declined such cookies. Respondent's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Claimant as to whether to use the Website. In misleading Claimant and not so informing him, Respondent breached its duty to him. Respondent also gained financially from, and as a result of, its breach.

183. Claimant relied to his detriment on Respondent's misrepresentations and fraudulent omissions.

184. Claimant has suffered an injury-in-fact, including the loss of money and/or property, as a result of Respondent's unfair, deceptive, and/or unlawful practices, including the unauthorized disclosure and taking of his personal information which has value as demonstrated by the use and sale of consumers' browsing activity, as alleged above. Claimant has also suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

185. Respondent's actions caused damage to, and loss of, Claimant's property right to control the dissemination and use of his personal information and communications.

186. Respondent's representation that consumers could decline such cookies, including functional cookies and cookies related to targeted advertising, and thereby opt out of

the sale of their personal information, was untrue. Again, had Claimant known these facts, he would not have used the Website. Moreover, Claimant reviewed the cookie popup window prior to using the Website. Had Respondent disclosed that it causes such cookies to be stored on consumers' devices, even when they choose to decline "ALL" such cookies, Claimant would have noticed it and would not have used the Website.

187. By and through such fraud, deceit, misrepresentations, and/or omissions, Respondent intended to induce Claimant, and those similarly situated, to alter their positions to their detriment. Specifically, Respondent fraudulently and deceptively induced Claimant, and those similarly situated, to, without limitation, use the Website under the mistaken belief that Respondent would not collect data itself or share users' personal data with third parties through the cookies when consumers chose to decline "ALL" cookies.

188. Claimant justifiably and reasonably relied on Respondent's misrepresentations and omissions, and, accordingly, was damaged by Respondent.

189. As a direct and proximate result of Respondent's misrepresentations and/or omissions, Claimant has suffered damages, as alleged above.

190. Respondent's conduct, as described herein, was wilful and malicious and was designed to maximize Respondent's profits even though Respondent knew that it would cause loss and harm to Claimant and other web users.

## **TWELFTH CAUSE OF ACTION**

### **Negligent Misrepresentation**

191. Claimant realleges and incorporates by reference all paragraphs alleged herein.

192. Respondent represented to Claimant a fact that was not true, namely, that users could "DECLINE ALL" "COOKIES ON THIS SITE" (Respondent's Website), or at least the "Functional and Targeting" cookies, inclusive of advertising cookies, further defined and described in Respondent's own Privacy Policy. In truth, Respondent caused such cookies and software code to be stored on consumers' devices and browsers, which caused the transmission of users' private web activity and Private Communications to third parties and Respondent, even after users rejected such cookies.

193. These representations were material at the time they were made. They concerned material facts that were essential to the decisions of Claimant and other users regarding whether and/or how to visit and use the Website.

194. Respondent made identical misrepresentations to other Website users regarding users' ability to decline, reject, or otherwise opt-out of the placement of such cookies.

195. Respondent should have known its representations were false, and that it had no reasonable grounds for believing them to be true when it made them.

196. Respondent intended that Claimant and users of the Website rely on Respondent's representations.

197. By and through such negligent misrepresentations, Respondent intended to induce Claimant, and those similarly situated, to alter their positions to their detriment. Specifically, Respondent negligently induced Claimant, and its Website's users, to without limitation, browse the Website under the mistaken belief that Respondent would not collect data itself or cause the sharing with third parties of the personal data of Claimant and those similarly situated after he/they chose to decline, reject, or otherwise opt-out of the placement of "ALL" cookies, or at least the "Functional and Targeting" cookies, inclusive of advertising cookies, described in Respondent's own Privacy Policy.

198. Claimant, and those similarly situated, reasonably relied on Respondent's representations.

199. Claimant, and those similarly situated, were harmed as set forth above.

200. The reliance of Claimant and those similarly situated on Respondent's representations was a substantial factor in causing the harm.

## <u>THIRTHEENTH CAUSE OF ACTION</u>

### Trespass to Chattels

201. Claimant realleges and incorporates by reference all paragraphs alleged herein.

202. At all times relevant, Claimant owned, leased, and/or controlled his devices.

203. Respondent, intentionally and without consent or other legal justification, caused cookies to be stored on Claimant's browsers and devices, which enabled third parties

and Respondent to track Claimant's activity on the Website and use the data collected for their own advantage, as described above.

204. Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could decline, reject, or otherwise opt-out of the placement of "ALL" cookies, or at least the "Functional and Targeting" cookies, inclusive of advertising cookies. Respondent further failed to disclose that it causes unwanted third-party cookies and software code to be stored on consumers' devices and browsers, which cause the transmission of users' private web activity and Private Communications to third parties and Respondent, even after consumers reject such cookies.

205. Respondent's intentional and unjustified placing of cookies designed to track Claimant's internet activities and actual tracking of Claimant's activities interfered with Claimant's use of the following personal property owned by Claimant: (a) his computers and other electronic devices; and (b) his personally identifiable information.

206. Respondent's trespass of Claimant's computing devices resulted in harm to Claimant and caused Claimant the following damages:

a. Nominal damages for trespass;

b. Reduction of storage, disk space, and performance of Claimant's computing devices; and

c. Loss of value of Claimant's computing devices.

## FOURTEENTH CAUSE OF ACTION

### Unjust Enrichment

207. Claimant realleges and incorporates by reference all paragraphs alleged herein.

208. Respondent created and implemented a scheme to increase its own profits through a pervasive pattern of false statements and fraudulent omissions.

209. Respondent was unjustly enriched as a result of its wrongful conduct, including through its misrepresentation that users could decline, reject, or otherwise opt-out of the placement of "ALL" cookies, or at least the "Functional and Targeting" cookies, inclusive of advertising cookies. Respondent further failed to disclose that it causes unwanted third-party

cookies and software code to be stored on consumers' devices and browsers, which cause the transmission of users' private web activity and Private Communications to third parties and Respondent, even after consumers reject such cookies.

210. Respondent received a measurable benefit at the expense of Claimant in the form of the additional data Claimant surrendered at Claimant's expense.

211. Respondent appreciated, recognized, and chose to accept the monetary benefits that Claimant conferred onto Respondent to his detriment. These benefits were the expected result of Mazda acting in its pecuniary interest at the expense of Claimant.

212. It would be unjust for Respondent to retain the value of Claimant's property and any profits earned thereon.

213. There is no justification for Respondent's enrichment. It would be inequitable, unconscionable, and unjust for Respondent to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct. Claimant is entitled to restitution of the benefits Respondent unjustly retained and/or any amounts necessary to return Claimant to the position he occupied prior to having his Private Communications obtained by Respondent.

214. Claimant pleads this claim separately, as well as in the alternative, to his other claims, as without such claims he would have no adequate legal remedy.

## PRAYER FOR RELIEF

WHEREFORE, reserving all rights, Claimant respectfully requests judgment against Respondent as follows:

A. An award of compensatory damages, including statutory damages where available, to Claimant against Respondent for all damages sustained as a result of Respondent's wrongdoing, including both pre- and post-judgment interest thereon;

B. An order for full restitution;

C. An order requiring Respondent to disgorge revenues and profits wrongfully obtained;

D. An order temporarily and permanently enjoining Respondent from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

E. For reasonable attorneys' fees and the costs of suit incurred; and

F. For such further relief as may be just and proper.

Dated: January 4, 2024

**GUTRIDE SAFIER LLP**

*/s/Seth A. Safier/s/*

Seth A. Safier (State Bar No. 197427)
seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
marie@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
todd@gutridesafier.com
Kali R. Backer (State Bar No. 342492)
kali@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, CA 94111
Telephone: (415) 639-9090
Facsimile: (415) 449-6469

*Attorneys for Claimant*

# EXHIBIT B

# WARNING!

DRIVER DISTRACTION MAY OCCUR IF THIS PHONE APPLICATION OR WEBSITE IS VIEWED WHILE OPERATING A MOTOR VEHICLE. DRIVING WHILE DISTRACTED CAN RESULT IN THE LOSS OF VEHICLE CONTROL, RESULTING IN A COLLISION CAUSING PROPERTY DAMAGE, SERIOUS INJURY, OR DEATH. A DRIVER SHOULD NOT USE ANY DEVICE OR THIS PHONE APPLICATION WHILE OPERATING A MOTOR VEHICLE.

# TERMS & CONDITIONS

These Terms & Conditions are applicable to your access to and use of the websites, mobile applications, and other online services operated by Mazda Motor of America, Inc., d/b/a Mazda North American Operations (also, "our", "us", or "we") that link to or incorporate these Terms & Conditions (the "Online Services"). Your access to and use of any of the Online Services, and the information, materials, products, and services available through such Online Services are subject to these Terms & Conditions, regardless of whether you possess an account through the Online Services linked to your name and/or contact information ("Account"). By accessing or using the Online Services, you acknowledge that you understand and agree to be bound by these Terms & Conditions. If you do not understand or agree to be bound by these Terms & Conditions, do not access or use the Online Services.

We reserve the right to modify these Terms & Conditions, in whole or in part, in our own discretion at any time. Such modifications shall be effective immediately upon the linking of modified Terms & Conditions to the Online Services, and if you possess an Account, by communicating the modifications to you either (i) when you log in to the Online Services, or (ii) by sending them to contact information that you have provided to us. You agree to comply with, and be bound by, any such modifications either (i) by continuing to use or access the Online Services after modified Terms & Conditions are posted to the Online Services, or (ii) if you possess an Account, by not requesting to terminate your Account within seven (7) days after receiving a notice of modifications as described above.

THIS AGREEMENT CONTAINS A MANDATORY ARBITRATION OF DISPUTES PROVISION THAT GENERALLY REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS, AND ALSO LIMITS THE REMEDIES AVAILABLE TO YOU IN THE EVENT OF A DISPUTE.

## PRIVACY POLICY

Our privacy policy ("Privacy Policy") is a part of the foregoing Terms & Conditions, and is incorporated herein by this reference. By accepting these Terms & Conditions you agree to our collection, use, and disclosure of your information as described in the Privacy Policy.

CLICK HERE TO VIEW THE PRIVACY POLICY.

## INTELLECTUAL PROPERTY

All text, images, graphics, animation, videos, music, sounds, and other materials on the Online Services are subject to the copyrights and other intellectual property rights of Mazda Motor of America, Inc., its affiliated companies, and its licensors. Mazda Motor of America, Inc. holds the copyrights in the selection, coordination, and arrangement of the materials on the Online Services. These materials may not be copied for commercial use or distribution, nor may these materials be modified or reposted to other websites. Notwithstanding the foregoing, you may view, use, download, and print selected portions of the Online Services solely for your own personal, non-commercial, informational use, provided that you do not republish these materials and that you keep intact all copyright, trademarks, servicemarks, attributions, patents, and other proprietary notices.

## YOUR PROVISION OF INFORMATION TO US

When you provide information about yourself to us, such as through the Online Services, you agree to: (a) provide accurate, current, and complete information about yourself, and not to provide information that attempts to impersonate another individual; and (b) maintain and promptly update such information to keep it accurate, current, and complete. If you provide any such information that is untrue, inaccurate, or incomplete, or we have reasonable grounds to suspect that such information is untrue, inaccurate, or incomplete, we retain the right to suspend or terminate any Account you establish and/or to refuse any or all current or future use of the Online Services or any portion thereof.

## YOUR CONDUCT

You agree to comply with all applicable laws, rules, and regulations when using the Online Services. You agree to not take any action that interferes with the proper working of the Online Services, compromi the security of the Online Services, or otherwise damages the Online Services or any materials and information available through the Online Services. You agree not to use the Online Services for any

purpose that is unlawful or prohibited by these Terms & Conditions, or to solicit the performance of any illegal activity or other activity which infringes our rights or the rights of others.

You agree not to attempt to gain unauthorized access to any portion or feature of the Online Services, to any other systems or networks connected to the Online Services, to any of our servers, or to any of the services offered on or through the Online Services, including but not limited to by hacking, password "mining", or any other unauthorized means.

You agree not to probe, scan, or test the vulnerability of the Online Services or any network connected to the Online Services, not to breach the security or bypass the authentication measures on the Online Services or any network connected to the Online Services, and not to upload any viruses or other malicious code to the Online Services. You agree not to attempt to reverse-look-up, trace, or seek to obtain any information about any other user of or visitor to the Online Services, or any other Mazda customer, including information associated with any Account not registered to or managed by you. You agree not to use the Online Services, or any service or information made available or offered by or through the Online Services, in any way where the purpose is to reveal any information, other than your own information or information that we make available to you through the Online Services.

You agree not to use any automated means to collect information or content from or otherwise access the Online Services, including but not limited to through the use of technical tools known as robots, spiders, or scrapers, without our prior permission.

## THIRD PARTY WEBSITES AND SERVICES

For your convenience, the Online Services may contain links to or at times redirect you to other websites and online services owned or controlled by third parties (collectively referred to as "Third-Party Service(s)"), including but not limited to the Roadside Assistance functionality of the MyMazda mobile phone application ("MyMazda"). Third-Party Services also include any connections made by the Online Services, at your request, to third-party social networking websites that are not owned or controlled by us, and any websites or online services owned or operated by third-party Mazda Dealers, such as when you request a quote, search dealer inventory, apply for financing, or shop for genuine Mazda accessories through accessories.mazdausa.com.

These Third-Party Services are not under our control, and you acknowledge and agree that your use of such Third-Party Services is subject to any relevant third-party terms and conditions, if applicable, and any information collected by such Third-Party Services is subject to those third-parties' respective privacy

policies. We recommend that you check the privacy policies of any linked Third-Party Services before providing any information to them.

You further acknowledge and agree that we and our affiliated companies are not responsible or liable for the accuracy, collection or use or disclosure of information, copyright compliance, legality, decency, or any other aspect of such Third-Party Services, or the content displayed on or through them. The inclusion of a link in the Online Services to such Third-Party Services does not imply our endorsement of any such Third-Party Service, the content displayed on or through it, or any association with its operators, and you agree not to hold us responsible for any harm that may arise based on your access to or use of any linked Third-Party Service.

The Roadside Assistance portion of MyMazda is provided by and/or through Agero Customer Services, Inc. ("ACSI"), and its affiliates, including, without limitation, Cross Country Motor Club, Inc. and Cross Country Motor Club of California, Inc., on our behalf. ASCI's terms and conditions, including ASCI's privacy policy, for the Roadside Assistance application, can be viewed in the following link:

Click here to view ASCI's terms and conditions and privacy policy for the third-party Roadside Assistance application portion of MyMazda.

## LINKS TO ONLINE SERVICES

Unless otherwise set forth in a written agreement between you and us, you must not include a link to any of our Online Services on any website or online service that you own, control, or operate except when complying with the following: (i) any link to the Online Services must be a text-only link clearly marked "external link to www.MazdaUSA.com," (ii) the appearance, position, and other aspects of the link may not be such as to damage or dilute the goodwill associated with any Mazda name or trademark, (iii) the link must take users directly to one of the Online Services without redirecting the user to any intermediate page, other than an interstitial that notifies users that they are leaving your website, (iv) the appearance, position, and other attributes of the link may not create the false appearance that your organization or entity is sponsored by, affiliated with, or associated with us, and (v) when clicked on by a user, the link must display one of the Online Services in a full browser screen and not within a "frame" on the linking website. Notwithstanding compliance with the foregoing, we reserve the right to request that any person or entity remove a link to any portion of the Online Services at any time and in our sole discretion.

## INFORMATION, NEWS, PRESS RELEASES AND ILLUSTRATIONS

The Online Services may contain information about our company, such as news and press releases. You acknowledge that we have no duty or obligation to maintain or update any such information, and agree that your reliance on any such information is at your own risk.

Information and illustrations on this Website are based on the latest competitive and Mazda product information available at the time of posting. Some equipment shown is optional at extra cost; specific options may be available only in combination with other options. Specific combinations of equipment, features, colors, and interiors may vary from time to time and by geographic area. Colors in illustrations may vary from actual upholstery or paint colors due to reproduction and the specifications of users' computer hardware and software. Mazda reserves the right to make changes without notice in product content and price at any time.

## PRICING

Currently, all prices listed on the Online Services reflect the manufacturer's suggested retail price (MSRP) for vehicles and accessories sold in the continental United States. Actual dealer prices may vary. While Mazda makes every effort to list accurate MSRP information on this Web site, Mazda is not responsible for pricing errors arising from technical malfunction of computer hardware and software.

## REGISTRATION AND PASSWORDS

The Online Services may permit or require you to register or obtain a password prior to permitting you to access certain portions of the Online Services. You acknowledge and agree that you are responsible for maintaining the confidentiality of your login ID and password, and for all uses of your login ID, password, and/or Account. You agree to notify us immediately of any unauthorized use of your login ID, password, or Account, or any other breach of security involving access to the Online Services through your Account. You acknowledge that you may be held liable for any loss or harm incurred by us or any other person or entity due to someone else using your login ID, password, or Account as a result of your failing to keep your Account information secure and confidential.

## MOBILE APPLICATIONS

As part of the Online Services, we may make certain mobile applications available to you (“Application(s)”), including but not limited to the MyMazda Application, which Applications are available for download on the Apple App Store and/or Google Play Store to an App Store and/or Play Store authorized mobile device that you own or control (your “Device”). In addition to all other

provisions of these Terms & Conditions for Online Services that are applicable to your use of an Application, you further understand and agree to the following (“Application Terms”):

(a) Provided you enable notifications in your Device settings, we may send notifications directly to your Device for our advertising purposes, or to communicate relevant recall, safety, or Application-related information (“Notices”). If at any time you wish to discontinue receiving Notices from us on your Device, you can disable notifications for the Application in your Device settings.

(b) Provided you allow notifications and enable location sharing in your Device settings, we may send you targeted Notices based upon your Device’s presence in a certain geographic area. If at any time you wish to discontinue sharing your Device location with the Application, you can disable location sharing for the Application in your Device settings.

(c) Through your use of our Applications, we may collect certain analytics information from the Application and/or your Device. We may use analytics information to provide Application services; provide you with relevant Notices, if applicable; or research, troubleshoot, improve, and/or otherwise evaluate the use of and effectiveness of our products and services, including Applications. You can restrict our access to certain Device analytics information, such as Device location, by disabling available sharing settings on your Device, however to fully restrict collection of analytics information from the Application and/or your Device, you should not use the Applications.

(d) For a full understanding of what types of information your Device may share with an Application, refer to the terms and conditions and/or privacy policy of the App Store, Play Store, and/or your Device manufacturer, as applicable.

(e) For a full understanding of what types of information we may obtain from you and how we may use it, refer to our Privacy Policy.

## SMS PROGRAM

For terms and conditions related to the Short Message Service ("SMS") Program, also known as the mobile text message program, click here.

## OPERATION OF THE ONLINE SERVICES

We reserve the right to do any of the following, at any time, at our sole discretion, with or without notice: (1) modify, suspend, or terminate operation of or your access to the Online Services, or any portion of the Online Services, including but not limited to for your violation of these Terms & Conditions; (2) modify or change the Online Services, or any portion of the Online Services; and (3) interrupt the regular operation of the Online Services, or any portion of the Online Services, as necessary to perform routine or non-routine maintenance, to correct errors, or to make other changes to the Online Services.

## DISCLAIMER OF WARRANTIES

THE ONLINE SERVICES AND ALL INFORMATION, MATERIALS, SOFTWARE, PRODUCTS, AND SERVICES INCLUDED IN OR AVAILABLE THROUGH THE ONLINE SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE" FOR YOUR USE. THE ONLINE SERVICES AND ALL INFORMATION, MATERIALS, SOFTWARE, PRODUCTS, AND SERVICES INCLUDED IN OR AVAILABLE THROUGH THE ONLINE SERVICES ARE PROVIDED WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. WE DO NOT WARRANT THAT THE INFORMATION, MATERIALS, SOFTWARE, PRODUCTS, AND SERVICES INCLUDED IN OR AVAILABLE THROUGH THE ONLINE SERVICES ARE ACCURATE, RELIABLE, OR CORRECT; THAT THE ONLINE SERVICES WILL BE AVAILABLE AT ANY PARTICULAR TIME OR LOCATION; THAT ANY DEFECTS OR ERRORS WILL BE CORRECTED; OR THAT THE ONLINE SERVICES ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. YOUR USE OF THE ONLINE SERVICES IS AT YOUR SOLE RISK. BECAUSE SOME JURISDICTIONS DO NOT PERMIT THE EXCLUSION OF CERTAIN WARRANTIES, THESE EXCLUSIONS MAY NOT APPLY TO YOU.

## DISPUTE RESOLUTION & ARBITRATION

These Terms and Conditions shall be treated as though they were executed and performed in California and shall be governed by and construed in accordance with the laws of California (without regard to conflict of law principles).

We expect that our customer service team will be able to resolve most issues you may have using the Online Services. You can contact our customer service team as described in the “Contact Us” section below. In the unlikely event that an issue remains unresolved, we prefer to specify now what each of u should expect in order to avoid any confusion later. Accordingly, you and Mazda agree to the following resolution process.

In an attempt to find the quickest and most efficient resolution of our issues, you and Mazda agree to first discuss any issue informally for at least 30 days. To do that, please send your full name, your email and/or mailing address, your concern, and your proposed solution by certified mail to us at: 200 Spectrum Center Drive, Suite 100, Irvine, CA 92618-5004, Attn: Legal Department. If we would like to discuss an issue with you, we will contact you using an email or mailing address we have on file for you.

IF WE DO NOT REACH AN AGREED UPON SOLUTION AFTER OUR DISCUSSIONS FOR AT LEAST 30 DAYS, YOU AND MAZDA AGREE THAT ANY CLAIM THAT EITHER OF US MAY HAVE ARISING OUT OF OR RELATING TO THESE TERMS AND CONDITIONS (INCLUDING FORMATION, PERFORMANCE, OR BREACH OF THEM), OUR RELATIONSHIP WITH EACH OTHER, OR USE OF THE ONLINE SERVICES MUST BE RESOLVED THROUGH BINDING INDIVIDUAL ARBITRATION BEFORE THE AMERICAN ARBITRATION ASSOCIATION USING ITS CONSUMER ARBITRATION RULES, AVAILABLE HERE. AS AN EXCEPTION TO THIS ARBITRATION AGREEMENT, EITHER YOU OR MAZDA MAY PURSUE IN SMALL CLAIMS COURT ANY CLAIM THAT IS WITHIN THAT COURT'S JURISDICTION AS LONG AS YOU PROCEED ONLY ON AN INDIVIDUAL BASIS.

NOTHING HEREIN SHALL BE CONSTRUED TO PRECLUDE ANY PARTY FROM SEEKING INJUNCTIVE RELIEF IN THE STATE OR FEDERAL COURTS LOCATED IN CALIFORNIA, IN ORDER TO PROTECT ITS RIGHTS PENDING AN OUTCOME IN ARBITRATION.

TO HELP RESOLVE ANY ISSUES BETWEEN US PROMPTLY AND DIRECTLY, YOU AND MAZDA AGREE TO BEGIN ANY ARBITRATION WITHIN ONE YEAR AFTER A CLAIM ARISES; OTHERWISE, THE CLAIM IS WAIVED.

YOU AND MAZDA ALSO AGREE TO ARBITRATE IN EACH OF YOUR AND OUR INDIVIDUAL CAPACITIES ONLY, NOT AS A REPRESENTATIVE OR MEMBER OF A CLASS, AND YOU AND WE EXPRESSLY WAIVE ANY RIGHT TO FILE A CLASS ACTION OR SEEK RELIEF ON A CLASS BASIS.

Rather than force everyone to visit us in California, if you can demonstrate to us that arbitration in California would create an undue burden to you, we will allow you to initiate the arbitration in your home state. Otherwise, the arbitration hearings will be held in Orange County, California. Any disagreements regarding the forum for arbitration will be settled by the arbitrator.

If you initiate the arbitration, your arbitration fees will be limited to the filing fee set forth in the AAA's Consumer Rules. Regardless of who initiates the arbitration, Mazda will pay any other arbitration fees, including your share of arbitrator compensation.

IT IS IMPORTANT THAT YOU UNDERSTAND THAT BY ENTERING INTO THIS AGREEMENT, BOTH YOU AND MAZDA ARE EACH WAIVING THE RIGHT TO A TRIAL BY JURY OR TO PARTICIPATE IN A CLASS ACTION AGAINST THE OTHER PARTY FOR CLAIMS THAT ARE COVERED BY THIS "DISPUTE RESOLUTION AND ARBITRATION " SECTION. THE ARBITRATOR'S DECISION WILL BE CONCLUSIVE AND BINDING AND MAY BE ENTERED AS A JUDGMENT IN ANY COURT OF COMPETENT JURISDICTION.

If the arbitrator rules against Mazda, in addition to accepting whatever responsibility is ordered by the arbitrator, Mazda will reimburse your reasonable attorneys' fees and costs, regardless of who initiated the arbitration. In addition, if the arbitrator rules in Mazda's favor, it will not seek reimbursement of our attorneys' fees and costs, regardless of who initiated the arbitration.

If you're not sure what all of this means, of course please feel free to ask an attorney.

## LIMITATION OF LIABILITY

UNDER NO CIRCUMSTANCES SHALL WE BE LIABLE FOR ANY DIRECT, INDIRECT, PUNITIVE, INCIDENTAL, SPECIAL, OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH THE USE OF, OR INABILITY TO USE, THE ONLINE SERVICES. THIS LIMITATION APPLIES WHETHER THE ALLEGED LIABILITY IS BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHER LEGAL THEORY, EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN THE EVENT SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF DAMAGES TO THE EXTENT INDICATED ABOVE, OUR LIABILITY IN SUCH JURISDICTIONS SHALL BE LIMITED TO THE EXTENT PERMITTED BY LAW.

## INDEMNIFICATION

You agree to defend, indemnify, and hold us, our affiliates, subsidiaries, joint ventures, third-party service providers, and our respective employees, contractors, agents, officers, and directors harmless from any and all liability, claims, and expenses (including reasonable attorneys' fees) that arise out of or are related to your violation of these Terms & Conditions or your use or misuse of the Online Services.

## CHOICE OF LAW AND JURISDICTION

You agree that these Terms & Conditions will be governed by and construed in accordance with the laws of the State of California without regard to the conflicts of laws rules of any jurisdiction, and that any

dispute arising out of or relating to these Terms & Conditions or your access to or use of the Online Services will be subject to the exclusive jurisdiction and venue of the courts located within the State of California. You agree to the personal jurisdiction and venue of these courts. Because some jurisdictions do not permit the choice of law, jurisdiction, or venue, these requirements may not apply to you.

### EQUITABLE RELIEF

You acknowledge that any breach or threatened breach of these Terms & Conditions will result in irreparable harm for which damages would not be an adequate remedy, and, therefore, in addition to our rights and remedies otherwise available at law, we shall be entitled to seek immediate equitable relief, including injunctive relief, as appropriate. If we seek any equitable remedies, we shall not be precluded or prevented from seeking remedies at law, nor shall we be deemed to have made an election of remedies.

### SEVERABILITY

If any provision of these Terms & Conditions is held unenforceable or invalid under any applicable law or is so held by an applicable court decision, such unenforceability or invalidity will not render these Terms & Conditions unenforceable or invalid as a whole, and such provision will be changed and interpreted so as to best accomplish the objectives of such unenforceable or invalid provision within the limits of applicable law or the applicable court decisions.

### WAIVER

Any waiver by us of a breach of any provision of these Terms & Conditions shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of these Terms & Conditions. Any such waiver must be in writing. Failure by us to insist upon strict adherence to any term of these Terms & Conditions on one or more occasions shall not be considered a waiver or deprive us of the right to insist upon strict adherence to that term or any other term of these Terms & Conditions in the future.

### CONTACT US

If you have any questions or concerns about the Online Services or these Terms & Conditions, please contact us here.

# EXHIBIT C

AMERICAN ARBITRATION ASSOCIATION® | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

Western Case Management Center
Neil Currie
Vice President
45 E River Park Place West
Suite 308
Fresno, CA 93720
Telephone: (877)528-0880
Fax: (855)433-3046

March 7, 2025

Seth A. Safier, Esq.
Gutride Safier, LLP
100 Pine Street
Suite 1250
San Francisco, CA 94111
Via Email to: Seth@gutridesafier.com

Peter Z. Stockburger, Esq.
Dentons US, LLP
4435 Eastgate Mall
Suite 400
San Diego, CA 92121-1980
Via Email to: peter.stockburger@dentons.com

Case Number: 01-24-0000-0462

Vishal Shah
-vs-
Mazda Motor of America, Inc. d/b/a Mazda North
American Operations (U.S.A)

Dear Parties:

This letter acknowledges the Arbitrator's dismissal of this matter. Therefore, on March 4, 2025, the American Arbitration Association (AAA) reviewed and finalized the billing for this matter and closed this case as dismissed.

Please note that the AAA WebFile® ECF Guidelines will not apply after the closing of the case. Therefore, any additional submissions from the parties in this matter should be submitted via email to the AAA, with copies sent to all other parties.

We thank Arbitrator Pollard, who is receiving a copy of this correspondence, for serving on this matter.

Pursuant to the AAA's current policy, in the normal course of our administration, the AAA may maintain certain electronic case documents in our electronic records system. Such electronic documents may not constitute a complete case file. Other than certain types of electronic case documents that the AAA maintains indefinitely, electronic case documents will be destroyed 18 months after the stated closing date.

Thank you for choosing the AAA to administer your arbitration.

Sincerely,

*/s/ Cynthia Gale on behalf of*
Terri Martinez
Manager of ADR Services
Direct Dial: (559) 490-1871
Email: TerriMartinez@adr.org

Supervisor Information: Donna Martinez, Director of ADR Services, donnamartinez@adr.org, (559) 490-1881

cc: Heather Karlstad
Kimberly Dennis, Esq.
Seth A. Safier, Esq.
Marie A. McCrary, Esq.
Francisco J. Rolon, Esq.
Todd Kennedy, Esq.
Kali R. Backer, Esq.